WITHDRAWN 10/11/12
REISSUED 10/11/12



**IN THE**
**TENTH COURT OF APPEALS**

—————————

**No. 10-11-00101-CR**

**ARTIS LEE POLLARD,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

—————————

**From the 85th District Court**
**Brazos County, Texas**
**Trial Court No. 10-02398-CRF-85**

## O P I N I O N

In nine issues, appellant, Artis Lee Pollard, challenges his capital-murder conviction pertaining to the shooting death of Terrell McCoy. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2011). We affirm.

# I. BACKGROUND

On the evening of December 22, 2006, Bennie Hawkins had a Christmas party at a small house he owned in Bryan, Texas.[1] At this party, Hawkins and twenty to twenty-five others fried fish, played cards, and shot craps. Several witnesses testified that the dice game was the main attraction at the party and that approximately $10,000 to $15,000 was in play at any given time. Among the people in attendance were Hawkins, McCoy, Xavier Young, Patrick Young, Marion Young, David Rayford, and Brandon Williams. Most of these men referred to themselves using aliases. In particular, witnesses confirmed that Marion was known as "Two-Tone" or "Tone"; that McCoy was referred to as "Mississippi"; and that Williams's alias was "Smoke." None of the witnesses who testified at trial saw Pollard at the party that night, and they denied knowing him. However, Xavier noted that there was a lot of tension between Smoke and Mississippi and that they stared at each other all night.[2] Nevertheless, the party continued on into the wee hours of the night.

At around 1:00 a.m., Xavier went out the back door of the house to smoke a cigarette when he was confronted by two men with guns. With a gun in his face, Xavier was ordered to get to the ground. Several witnesses testified that both men had braided hair, bandannas covering their faces, Creole accents, and nine-millimeter pistols. Witnesses saw a third robber—who had braids, a bandanna covering his face, and a

---

[1] Witnesses testified that Hawkins's house was secluded and that the area surrounding the house was pitch dark on the night of the incident.

[2] Two-Tone also observed the tension between Smoke and Mississippi, noting that Smoke and Mississippi "had some words or something out" at the party.

Creole accent—running from around the side of the house carrying an AK-47. The third robber ordered the two other men to shoot Xavier, but before they could do so, Xavier slammed the back door and ran inside towards the restroom. The robbers shot through the door and came inside.

Once the robbers were inside the house, people scattered, including eight to ten people who followed Xavier into the restroom. The robbers ordered everyone to empty their pockets and come into the living room. After emptying his pockets, Xavier sat down on a loveseat next to Mississippi. The robbers threatened that they would kill everyone if they found money in people's shoes or in other places. One of the robbers checked Two-Tone's shoes and found nothing. Shortly thereafter, one of the robbers stood up and shot Mississippi in the head several times. Xavier stated that Mississippi did not appear to be worried about the robbery and that Mississippi was shot before he could answer Xavier's question as to the identity of the robbers. One of the bullets ended up hitting Xavier in the hip and exiting out his back. After being shot, Xavier fainted, and Mississippi died immediately. Later, Xavier was taken to the hospital for medical treatment.

Subsequently, police investigated the scene of the crime. Paul Martinez, an investigator with the Brazos County Sheriff's Department, found four nine-millimeter shell casings on the floor, a bullet lodged in a door jamb, another bullet underneath a cushion in the couch, and several blood drops and smears that appeared to be fresh. Martinez sent the items collected from the crime scene to be DNA-tested. Initially, forensic investigators were unable to identify the source of a couple of the blood drops

found inside Hawkins's house. In the meantime, Martinez questioned the people who attended the party that night, including Smoke. Martinez later determined that Pollard was a person of interest.

However, Pollard proved to be difficult for Martinez to track down. At trial, Pollard testified that he fled his hometown of Brenham, Texas, when friends notified him that the police wanted to question him. Pollard insisted that he fled because he had outstanding misdemeanor warrants, though he admitted that he was aware that Mississippi had been killed and that blood from an unknown source, which was later confirmed to be Pollard's, was found at the scene of the crime. In his flight from law enforcement, Pollard used an alias, was aware that police used a helicopter to look for him, and told friends that he needed to change the plates on his car and that Texas law enforcement did not have jurisdiction to arrest him at his final destination—his place of birth, New Orleans, Louisiana.

Law enforcement finally caught up with Pollard, resulting in his arrest in St. Bernard Parish, Louisiana. Martinez interviewed Pollard on June 5, 2009, and after waiving his *Miranda* rights, Pollard agreed to speak with Martinez. In his conversation with Martinez, Pollard stated that he was at a bar in Giddings, Texas, the night that Mississippi was killed. Pollard denied shooting Mississippi, and he denied ever having been to Hawkins's house. During a second conversation with Martinez, Pollard reiterated that he was at a club in Giddings on the night of the murder and that he had never been to Hawkins's house. Pollard added that he had only been to Bryan to go to

the mall or the movies, not to shoot dice. When asked about the blood drops found inside Hawkins's house, Pollard denied that the blood was his.

Pollard was subsequently transported back to Texas, where he was incarcerated in the Washington County jail. During Pollard's stay in the Washington County jail, Jailer Christopher Kulow received a telephone call from Texas Department of Public Safety Sergeant Robert Neuendorf, who was also investigating the case. Sergeant Neuendorf asked Kulow if he could isolate Pollard to obtain a sample of his DNA. Apparently, Pollard had been issued a cup and a spoon when he was admitted to the Washington County jail, and he had made it a point to wash the cup and spoon several times a day to prevent prison officials from obtaining a sample of his DNA.[3] Kulow offered Pollard the opportunity to make a telephone call in a detoxification cell ("detox cell"). According to Kulow, the "detox cell was empty and had been cleaned previously by a floor worker," and the telephone in the "detox cell" had better reception than others. Pollard accepted Kulow's offer and proceeded to talk on the telephone for approximately three hours. While making his rounds, Kulow observed Pollard's actions and noted that Pollard was the only inmate in the "detox cell."

When it was time for the inmates to eat, Kulow offered to let Pollard eat his meal in the "detox cell." Pollard agreed. When Pollard finished with his meal and his telephone calls, he stood at the bars of the "detox cell" until he was escorted back to his cell.[4] After escorting Pollard back to his cell, Kulow returned to the "detox cell" to

---

[3] At some point, police requested that Pollard provide a DNA sample, but he refused to comply.

retrieve the cup and the spoon. While wearing gloves, Kulow picked up the cup and spoon, placed it in a bag, and contacted Sergeant Neuendorf, who came by to pick up the items an hour later.

Pollard's DNA on the cup and the spoon were compared to the blood drops found at Hawkins's house, and as mentioned earlier, it was determined that Pollard was the source of the unknown blood drops found at Hawkins's house. Police later obtained a search warrant to take a buccal swab from Pollard, which further confirmed that he was the source of the unknown blood drops at Hawkins's house.

Pollard was charged by indictment with capital murder. *See id.* Prior to trial on this matter, Pollard filed four separate motions to suppress, challenging: (1) DNA evidence collected from the cup and spoon Pollard handled in the "detox cell"; (2) statements Pollard made to Martinez; (3) evidence obtained from the collection of Pollard's saliva; and (4) evidence obtained from Pollard's cellular telephone. The trial court denied all of Pollard's motions to suppress and entered numerous findings of fact and conclusions of law.

Trial commenced in this matter on February 21, 2011, and Pollard testified on his own behalf. In his testimony, Pollard offered yet another explanation regarding his whereabouts on the night of the incident. Pollard admitted that he was at Hawkins's house that night and that he was shooting dice with everyone else. Pollard stated that he was caught switching dice—cheating—while playing and that he was subsequently

---

[4] Kulow testified that Pollard was not handcuffed when he was moved from his cell to the "detox cell" and back.

assaulted by others who were playing, which resulted in Pollard getting cut on his elbow and bleeding inside the house. When asked why he lied to police about his whereabouts that evening, Pollard responded, "Because my name was never brought up in the investigation from the police who was [sic] there." Nevertheless, Pollard testified that, after getting thrown out of the party, he went to Brenham, Texas. He denied participating in the robbery, and he emphasized that he has tattoos on his hand and forearms which are visible to others.[5] Pollard also acknowledged that he had not been truthful to police about other aspects of the case, and that he had communicated to Keith Williams, the father of his sister's child, that: (1) he needed to change the plates on his car; (2) he was 100-percent loyal and to tell everybody that they need not worry because he was not going to talk; and (3) he was certain that law enforcement did not have his DNA.

At the conclusion of the evidence, the jury convicted Pollard of the charged offense. The trial court assessed punishment at life imprisonment without parole in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

## II. POLLARD'S CONFRONTATION-CLAUSE OBJECTION

In his first issue, Pollard argues that the trial court erred in permitting the State to introduce the results of scientific testing based on the work done by a person other than the State's expert witness at trial, even though Pollard objected that the testimony

---

[5] Pollard seemed to suggest that, because eyewitnesses and the police did not document the fact that one of the assailants had tattoos on his hands and forearms, he could not be identified as a participant in the robbery.

violated the Confrontation Clause of the United States and Texas Constitutions. *See* U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10.

## A. Applicable Law

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. This procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1067-68, 13 L. Ed. 2d 923 (1965); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Consistent with the Confrontation Clause guarantee, a testimonial hearsay statement may be admitted in evidence against a defendant "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1373-74, 158 L. Ed. 2d 177 (2004); *see De La Paz*, 273 S.W.3d at 680. "[T]he *Crawford* rule reflects the Framers' preferred mechanism (cross-examination) for ensuring that inaccurate out-of-court testimonial statements are not used to convict an accused." *Whorton v. Bockting*, 549 U.S. 406, 418, 127 S. Ct. 1173, 1182, 167 L .Ed. 1 (2007); *De La Paz*, 273 S.W.3d at 680. "Generally, speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz*, 273 S.W.3d at 680. Whether a statement is testimonial is a question of law. *Id.; see Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

**B.    Discussion**

Here, Pollard complains that the State offered the testimony of Brandi Mohler, a forensic scientist for the Texas Department of Public Safety ("DPS"), in lieu of Jane Burgett, the DPS forensic scientist who actually DNA-tested the seized spoon and cup and compared the DNA profile to that of the blood drops found at Hawkins's house. Specifically, Pollard argued at the hearing on one of his motions to suppress that:  "To the extent that Brandi Mohler is relying upon swabbing done by another expert who is not subject to cross-examination, we would object on confrontation grounds under the state and federal Constitution."  Pollard later clarified his objection, stating the following:  "We consider this lynch pin.  The swabbing of the spoon that—from which DNA was extracted is testimonial evidence.  We contend it—in fact, it meets the requirements of testimonial evidence under *Crawford* and would object to any evidence offered by the expert Brandi Mohler that relies on the testimonial evidence, the swabbing of the spoon."  The trial court subsequently denied Pollard's objection. Pollard then requested a running objection to testimony regarding the swabbing of the spoon, which the trial court granted.

Mohler testified that she "did not process the evidence."  However, she noted that:  "I actually extracted DNA from the swabs of the teaspoon and the cup and subjected them to PCR, which I was talking about is the copying of the DNA.  And then I compared that to a profile that was obtained from Item 7 which is [the blood found near] the rear point of entry [of Hawkins's house] and is—and I compared it to Item P1[,] which is the teaspoon."  Nevertheless, Mohler later acknowledged that she relied

on the work of another analyst, Burgett, in forming her opinions in this case. And, as Pollard notes, the seized cup and spoon were delivered to the DPS lab on July 22, 2009; but, Mohler was not certified to perform DNA analyses until September 19, 2009.

Despite this testimony, Mohler also testified that the DPS lab received a known saliva sample from Pollard on March 1, 2010. Mohler, having obtained certification to perform DNA analyses at this point, conducted the DNA testing on the known saliva sample and compared it to the blood drops found at Hawkins's house. Mohler's testing revealed that Pollard was the source of the blood drops.

Because this issue is of a constitutional dimension, we must reverse Pollard's conviction unless we are satisfied beyond a reasonable doubt that the alleged error did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a). Courts reviewing whether an error in admitting an out-of-court statement in violation of the Confrontation Clause is harmless beyond a reasonable doubt should consider several factors: (1) the importance of the hearsay statements to the State's case; (2) whether the hearsay statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and (4) the overall strength of the prosecution's case. *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006). In conducting this harm analysis, we consider the likelihood that the constitutional error adversely affected "the integrity of the process leading to the conviction." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).

Assuming without deciding that the trial court erred in admitting Mohler's testimony that relied on Burgett's testing of the seized cup and spoon, we can say,

beyond a reasonable doubt, that the trial court's admission of the complained-of evidence did not contribute to Pollard's conviction or punishment. *See Scott*, 227 S.W.3d at 690-91; *see also Davis*, 203 S.W.3d at 852. In fact, the complained-of evidence was: (1) cumulative of Mohler's testimony regarding her DNA-testing of Pollard's saliva; (2) not absolutely necessary to the State's case because the results of Mohler's DNA-testing of Pollard's saliva proved the same fact; and (3) corroborated by Mohler's DNA-testing of Pollard's saliva. *See Davis*, 203 S.W.3d at 852. Furthermore, the DNA tests on Pollard's saliva confirmed that he had lied to police and placed Pollard at the scene of the crime on the night of the incident—both facts that strengthened the State's case. *See id.*

In addition, Pollard also appears to argue that his right to confront Burgett was violated regarding all of the items she tested. However, when reviewing the record, Pollard's Confrontation Clause objection was limited to Mohler's reliance on Burgett's testing of the spoon. Thus, Pollard's complaint on appeal does not comport with his objection in the trial court. *See* Tex. R. App. P. 33.1(a)(1); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (stating that a complaining party must make a timely and specific objection to preserve error for appellate review); *see also Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) (noting that points of error on appeal must correspond or comport with objections and arguments made at trial) (citing *Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1998))). "Where a trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review." *Wright*, 154 S.W.3d at 241; *see Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999). Accordingly, we overrule Pollard's first issue.

### III.    POLLARD'S MOTIONS TO SUPPRESS EVIDENCE

In his second through fifth issues, Pollard complains about the trial court's denial of his motions to suppress evidence pertaining to the warrantless seizure of his DNA from the cup and spoon, the DNA-testing of his saliva, evidence obtained from his cell phone, and statements he made to Martinez.[6]

### A.    Standard of Review

We review the trial court's ruling on a motion to suppress evidence for an abuse of discretion, using a bifurcated standard. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). We give "almost total deference" to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We review de novo the trial court's determination of the law and its application of law to facts that do not turn upon an evaluation of credibility and demeanor. *Id.* When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling, so long as it finds some support in the record. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex.

---

[6] To the extent that Pollard argues that the actions subject to his motions to suppress violated the Texas Constitution, we note that Pollard fails to analyze, argue, or provide authority to establish that his protection under the Texas Constitution exceeds or differs from that provided to him by the Federal Constitution. *See Arnold v. State*, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993) (declining to analyze an appellant's state constitutional argument regarding the suppression of his confession because appellant failed to analyze, argue, or provide authority establishing that his protection under the Texas Constitution exceeded or differed from the protections afforded under the Federal Constitution). In fact, he acknowledges that the Texas Constitution does not provide protections greater than the Fourth Amendment to the Federal Constitution. Thus, we will not address Pollard's state constitutional arguments and, instead, analyze his complaints within the context of the Federal Constitution. *See Green v. State*, 934 S.W.2d 92, 96 n.1 (Tex. Crim. App. 1996); *Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993); *see also Olivarez v. State*, 171 S.W.3d 283, 288 n.2 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Crim. App. 2006); *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App. 2007). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

When a trial judge makes explicit fact findings regarding a motion to suppress, an "appellate court [must first] determine whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings." *Kelly*, 204 S.W.3d at 818; *see State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011) ("When the trial judge makes explicit findings of fact, we afford those findings almost total deference as long as the record supports them . . . ."). "The appellate court then reviews the trial court's legal ruling[s] de novo unless the trial court's supported-by-the-record explicit fact findings are also dispositive of the legal ruling." *Kelly*, 204 S.W.3d at 818.

## B.    DNA obtained from the cup and spoon

In his second issue, Pollard contends that the trial court abused its discretion in denying his motion to suppress evidence obtained from the warrantless seizure of his DNA from the cup and spoon taken from the "detox cell." In the trial court, Pollard initially argued that he had a reasonable expectation of privacy in the cup and spoon that was collected by Kulow. However, in his motion to suppress, Pollard amended his argument to state that he has a reasonable expectation of privacy in his DNA. The State countered that Pollard did not have a reasonable expectation of privacy in his DNA and that he abandoned the seized cup and spoon when he returned to his cell. As stated

earlier, the trial court denied Pollard's motion to suppress and entered numerous findings of fact and conclusions of law.

Essentially, Pollard asserts that his Fourth-Amendment right to be free from unreasonable seizures was violated. *See* U.S. CONST. amend. IV. The United States Supreme Court has held that the applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Hudson v. Palmer*, 468 U.S. 517, 525, 104 S. Ct. 3194, 3199, 82 L. Ed. 2d 393 (1984) (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220 (1979)). The Texas Court of Criminal Appeals has stated that the burden of establishing a legitimate expectation of privacy is upon the defendant. *See Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) (citing *Calloway v. State*, 743 S.W.2d 645, 650 (Tex. Crim. App. 1988)). "To carry this burden, the accused must normally prove: (a) that by his conduct, he exhibited an actual subjective expectation of privacy, i.e., a genuine intention to preserve something as private; and (b) that circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable." *Id.*

However, the collection of DNA from prisoners has been found to be reasonable in light of an inmate's diminished privacy rights, the minimal intrusion involved, and the legitimate government interest in using DNA to investigate crime. *See Hudson*, 468 U.S. at 525-26, 104 S. Ct. at 3200 ("[W]e hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison

cell . . . . The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."); *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411, 413 (5th Cir. 2004); *Velasquez v. Woods*, 329 F.3d 420, 421 (5th Cir. 2003) (per curiam) (holding that the collection of DNA samples from felons does not violate the Fourth Amendment); *Oles v. State*, 993 S.W.2d 103, 108 (Tex. Crim. App. 1999) ("[W]hile an appellant is incarcerated, he has no expectation of privacy in the jail cell . . . ."); *see also Drewery v. State*, No. 08-04-00201-CR, 2005 Tex. App. LEXIS 5898, at **21-22 (Tex. App.—El Paso July 28, 2005, pet. ref'd) (mem. op., not designated for publication).

In the present case, Pollard declined to voluntarily provide police with a sample of his DNA and told Williams that the police did not have his DNA.[7] In addition, Pollard presented testimony that he washed his cup and spoon several times a day to prevent law enforcement from collecting his DNA. However, as stated in the trial court's findings of fact, Pollard voluntarily accepted prison officials' offer to make telephone calls in the "detox cell." Moreover, the evidence adduced at trial demonstrated that Pollard did not object to eating in the "detox cell" and using a different prison-issued Styrofoam cup and plastic spoon. And unlike the cup and

---

[7] Pollard also asserts that police improperly collected his DNA because the collection of DNA samples from pre-trial detainees is not permissible according to section 411.148 of the Texas Government Code. *See* TEX. GOV'T CODE ANN. § 411.148 (West Supp. 2011). This particular portion of the government code pertains to the mandatory collection of DNA samples from incarcerated inmates for the creation of a DNA database. *See id.* §§ 411.141-.148 (West Supp. 2011). In particular, section 411.148 of the Texas Government Code requires a DNA sample from individuals who are confined in a penal institution after sentencing and before admission to the Texas Department of Criminal Justice and allows prison officials to use force if it is necessary to collect such a sample. *See id.* § 411.148(h), (i)(1)(A). However, because Pollard voluntarily left his DNA behind on the cup and spoon located in the "detox cell," we do not find these statutory provisions to be relevant.

spoon he left behind in his cell, Pollard did not make any attempt to keep the cup and spoon issued in the "detox cell," nor did he request to keep or wash those items to prevent police from collecting his DNA. In addition, the record does not contain any evidence indicating that Pollard was told that he could not take the cup and spoon with him.

When he was finished making his telephone calls, Pollard stood at the bars and waited to be escorted back to his cell. Ostensibly, Pollard abandoned the cup and spoon in the "detox cell"; therefore, in this instance, he did not demonstrate a genuine intention to keep his DNA private.[8] *See McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1997) ("[A]bandonment is primarily a question of intent to be inferred from words spoken, acts done, and other objective facts and relevant circumstances, with the issue not being in the strict property-right sense, but rather whether the accused had voluntarily discarded, left behind, or otherwise relinquished his interest in the property so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search."); *Brimage v. State*, 918 S.W.2d 466, 507 (Tex. Crim. App. 1994) (op. on reh'g) (en banc) ("We have held that an abandonment of property occurs if (1) the defendant intended to abandon the property and (2) his decision to abandon the property was not due to police misconduct."); *Hawkins v. State*, 758 S.W.2d 255, 257

---

[8] Pollard contends that the collection of his DNA from the cup and spoon "was not through appellant's voluntary conduct, but purely by virtue of the control exercised over him through his incarceration." Despite this assertion, Pollard does not specifically mention any conduct that would amount to police misconduct and, thus, undermine the trial court's conclusion of law that Pollard abandoned the cup and spoon in the "detox cell." Furthermore, we find it curious that Pollard went to great efforts to protect his DNA with regard to the cup and spoon in his cell but made no efforts whatsoever to protect the DNA on the cup and spoon given to him while he was in the "detox cell." In addition, the record indicates that Pollard willingly went to the "detox cell" to make the telephone calls and to eat, undermining any assertion of control or coercion by the police.

Pollard v. State                                                                                           Page 16

(Tex. Crim. App. 1988) ("The general rule in Texas with respect to abandoned property has been that 'when police take possession of abandoned property, there is not a seizure under the Fourth Amendment." (quoting *Clapp v. State*, 639 S.W.2d 949, 953 (Tex. Crim. App. 1982))); *see also Hudson v. State*, 205 S.W.3d 600, 604-05 (Tex. App.—Waco 2006, pet. ref'd) (holding that the warrantless seizure of a defendant's DNA from a Dr. Pepper can that was voluntarily thrown in the trash did not violate the Fourth Amendment because the defendant's action of throwing the can in the trash indicated an intent to abandon the can).

Because prisoners have diminished privacy rights during incarceration, the collection of DNA from prisoners has been found to be reasonable in light of an inmate's diminished privacy rights, the minimal intrusion involved, and the legitimate government interest in using DNA to investigate crime, and because Pollard abandoned the cup and spoon in the "detox cell," we conclude that Pollard failed to satisfy his burden of proving a legitimate expectation of privacy in either the cup and spoon or his own DNA. *See Villarreal*, 935 S.W.2d at 138. Accordingly, we cannot say that the trial court abused its discretion in denying Pollard's motion to suppress the seizure of his DNA from the cup and spoon found in the "detox cell." *See Crain*, 315 S.W.3d at 48; *see also Guzman*, 955 S.W.2d at 88-89. We overrule Pollard's second issue.

## C.      DNA testing of Pollard's saliva and evidence obtained from his cell phone

In his third and fourth issues, Pollard also argues that the trial court abused its discretion in denying his motion to suppress DNA evidence collected from his saliva and evidence collected from his cell phone. Specifically, Pollard alleges:

As the trial court found, the subsequent warrants for appellant's saliva and the contents of his cell phone were obtained as a result of the information from the warrantless seizure. . . .  When the results of DNA comparison based on the warrantless seizure is [sic] removed from the warrant applications, they fail to establish probable cause.  The State offered no other basis to establish probable cause.  The trial court erred in denying appellant's motions to suppress the evidence obtained as a result of the search warrant for appellant's saliva and cell phone.

(Citation omitted).

Clearly, Pollard's complaints about the evidence obtained from his saliva and the cell phone are premised on his assumption that the DNA evidence obtained from the cup and spoon from the "detox cell" is inadmissible as an illegal seizure.  However, because we have already concluded that the collection of Pollard's DNA evidence from the cup and spoon from the "detox cell" did not amount to an illegal seizure and because the result of the DNA-testing demonstrated that Pollard was the source of the blood drops at Hawkins's house, we cannot say that the State lacked probable cause to obtain the search warrants to test Pollard's saliva and search the contents of his cell phone.  *See Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (stating that probable cause exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found); *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007) ("The cornerstone of the Fourth Amendment and its Texas equivalent is that a magistrate shall not issue a search warrant without first finding 'probable cause' that the particular item will be found in a particular location." (citing U.S. CONST. amend. IV; TEX. CONST. art. I, § 9)).  Based on the record before us, we cannot conclude that the trial court abused its

discretion in denying Pollard's motions to suppress this evidence. *See Crain*, 315 S.W.3d at 48; *see also Guzman*, 955 S.W.2d at 88-89. Accordingly, Pollard's third and fourth issues are overruled.

### D.    Pollard's Statements to Martinez

Though Pollard complains in his fifth issue that the trial court abused its discretion in denying his motion to suppress statements he made to Martinez in Louisiana, he does not provide any argument or authority in support of his contention. Texas Rule of Appellate Procedure 38.1(i) states that, to present an issue for review, a brief must contain appropriate citations to authorities. TEX. R. APP. P. 38.1(i). Because Pollard does not cite to any authority and does not provide any argument in support of this issue, we conclude that Pollard's fifth issue is inadequately briefed and presents nothing for review. *See id.*

### IV.    SUFFICIENCY OF THE EVIDENCE

In his sixth issue, Pollard contends the evidence supporting his conviction in this case is insufficient. Specifically, Pollard argues that he "denied involvement . . ., and no witness identified [him] as shooting Terrell McCoy or participating in the robbery."

### A.    Standard of Review

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2792-93. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

The sufficiency of the evidence is measured by reference to the elements of the offense as defined by a hypothetically-correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Under a hypothetically-correct jury charge, the State was required to prove beyond a reasonable doubt that Pollard intentionally

committed a murder in the course of committing or attempting to commit robbery, among other things. *See* TEX. PENAL CODE ANN. § 19.03(a)(2).

**B.    Law of Parties**

Here, the jury was charged on the law of parties and conspiracy. *See* TEX. PENAL CODE ANN. §§ 7.01-.02 (West 2011); *see also Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989). When a jury is charged on the law of parties, a person may be convicted as a party to an offense, if the offense is committed by his own conduct or by the conduct of another for which he is criminally responsible. TEX. PENAL CODE ANN. § 7.01(a). In determining whether the evidence is sufficient to prove that a defendant participated as a party in committing an offense, we look to "events before, during, and after the commission of the offense." *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

A person is a conspirator under the law of parties if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators. *See* TEX. PENAL CODE ANN. § 7.02(b). If the felony actually committed should have been anticipated as a result of carrying out the conspiracy, then all conspirators are guilty of the felony actually committed, even if they had no intent to commit it. *See id.*

It is well-settled that a person can be found guilty of capital murder as a conspiring party under section 7.02(b). *See id.*; *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992); *see also Demus v. State*, No. 05-09-00175-CR, 2010 Tex. App. LEXIS 429, at **7-9 (Tex. App.—Dallas Jan. 26, 2010, pet. ref'd) (mem. op., not designated for

publication). If the evidence demonstrates that the defendant conspired with others to commit robbery and, during the robbery, one of the co-conspirators commits capital murder, the defendant can be held criminally responsible for capital murder if it was in furtherance of the conspiracy's unlawful purpose and should have been anticipated. *See Longoria v. State*, 154 S.W.3d 747, 755 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Moreover, Texas courts have held that a conspirator should have anticipated that a murder would occur when he knew that a co-conspirator was carrying a gun. *See Longoria*, 154 S.W.3d at 756-57; *see also Demus*, 2010 Tex. App. LEXIS 429, at *8.

## C.    Discussion

The evidence showed that, on the night of the incident, Hawkins held a party at his house, which was located in a secluded area, and that many of those who attended the party shot dice and bet thousands of dollars on the game. In addition, witnesses testified that they did not see Pollard at the party, which undermined Pollard's testimony at trial that he gambled at the party but was thrown out and assaulted when he was caught cheating. Pollard's testimony was further undermined by his prior statements to police that he had never been to Hawkins's house and that the blood found inside the house was not his. In any event, witnesses recalled that Smoke was in attendance and that he and Mississippi, the deceased, had words during the game and appeared to be hostile towards each other. Xavier testified that he saw Smoke leave the party approximately fifteen minutes before the robbery occurred. Later, while going outside to smoke a cigarette, Xavier was accosted by two men with bandannas over their mouths. A third man ran from around the side of the house to where the others

were. Xavier recalled that all of the men were carrying firearms, had braids, and had Creole accents.

Once inside the house, the three robbers had all of the party attendees congregate in the living room and hand over their money. At some point, one of the robbers stated that there should have been more money and demanded to inspect Two-Tone's shoes and socks. Shortly thereafter, Mississippi was shot and killed. Pollard admitted that he knew Mississippi and that he was friends with Smoke. In addition, Pollard's blood was found inside the house, and several witnesses testified that the blood was not inside the house prior to the robbery. Moreover, Pollard acknowledged that he was from New Orleans, Louisiana, and that he had braids at the time of the robbery.

Further, the State presented evidence regarding Pollard's flight from law enforcement during the investigation of the incident, which, as the Texas Court of Criminal Appeals has held, is also indicative of guilt. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007); *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). In particular, Pollard admitted to going to great lengths to avoid being arrested, including using an alias, fleeing to Louisiana in an attempt to avoid the jurisdiction of Texas law enforcement, and indicating to Williams that he needed to change the plates on his car. Pollard also testified that he told Williams that: there was no way investigators had his DNA because he washed his cup and spoon two or three times a day after they initially requested a DNA sample from him; he was 100 percent loyal; and that nobody needed to worry because he was not going to talk to investigators.

Viewing the evidence in the light most favorable to the jury's verdict, we find that a rational juror could conclude that the combined and cumulative force of all of the evidence indicated that Pollard was a party to the robbery and killing of Mississippi under either section 7.01(a) or 7.02(b) of the penal code, *see* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(b); thus, we hold that the evidence is sufficient to affirm Pollard's conviction under the law of parties. *See Lucio*, 351 S.W.3d at 894; *see also Hooper*, 214 S.W.3d at 13. Pollard's sixth issue is overruled.

### V. THE JURY CHARGE AND INSTRUCTIONS ON LESSER-INCLUDED OFFENSES

In his final three issues, Pollard asserts that the trial court erred in denying his requests for instructions in the jury charge about the lesser-included offenses of murder, aggravated robbery, and robbery.

An offense qualifies as a lesser-included offense of the charged offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish the commission of the offense; (3) it differs from the offense charged only in that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense. TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006). To determine whether a defendant is entitled to an instruction on a lesser-included offense, the court conducts a two-pronged test. *See Ex parte Watson*, 306 S.W.3d 259, 272-73 (Tex. Crim. App. 2009); *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007). The first prong of the test requires

the court to use the "cognate pleadings" approach to determine whether an offense is a lesser-included offense of another offense. The first prong is satisfied if the indictment for the greater-inclusive offense either: "(1) alleges all of the elements of the lesser-included offense, or (2) alleges elements plus facts (including descriptive averments, such as non-statutory manner and means, that are alleged for purposes of providing notice) from which all of the elements of the lesser-included offense may be deduced." *Ex parte Watson*, 306 S.W.3d at 273.

> Both statutory elements and any descriptive averments alleged in the indictment for the greater-inclusive offense should be compared to the statutory elements of the lesser offense. If a descriptive averment in the indictment for the greater offense is identical to an element of the lesser offense, or if an element of the lesser offense may be deduced from a descriptive averment in the indictment for the greater-inclusive offense, this should be factored into the lesser-included-offense analysis in asking whether all of the elements of the lesser offense are contained within the allegations of the greater offense.

*Id.* This inquiry is a question of law. *Hall*, 225 S.W.3d at 535.

The second prong asks whether there is evidence that supports giving the lesser-included-offense instruction to the jury. *Id.* at 536. A defendant is entitled to a requested instruction on a lesser-included offense when the proof for the charged offense subsumes the proof required to establish the lesser-included offense and some evidence in the record would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Id.* A lesser-included-offense instruction is required when the evidence establishes the lesser-included offense as a valid, rational alternative to the charged offense. *Id.*

However, the Texas Court of Criminal Appeals has held that:

> A defendant's own testimony that he committed no offense, or testimony that otherwise shows that no offense occurred at all, is not adequate to raise the issue of a lesser-included offense. In *Bignall v. State*, we concluded, "if a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence otherwise showing that he is guilty of a lesser-included offense, then a charge on a lesser-included offense is not required." The evidence must establish that if a defendant is guilty, he is guilty only of the lesser[-]included offense.

*Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001) (internal citations omitted).

Here, Pollard told police on two different occasions that he had never been to Hawkins's house. Later at trial, Pollard testified on his own behalf and told the jury that he did attend the party to shoot dice but that he was thrown out and assaulted for cheating. Throughout his testimony and his statements to police, Pollard denied committing any offense. Because Pollard denied committing any offense and because we have already concluded that the evidence is sufficient to support his conviction for capital murder, we cannot say that the trial court erred in denying his request for instructions in the jury charge on the lesser-included offenses of murder, aggravated robbery, and robbery. *See Lofton*, 45 S.W.3d at 852 (citing *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000); *Arevalo v. State*, 943 S.W.2d 887, 889-90 (Tex. Crim. App. 1997); *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). We overrule Pollard's seventh, eighth, and ninth issues.

## VI.   CONCLUSION

Having overruled all of Pollard's issues on appeal, we affirm the judgment of the trial court.

AL SCOGGINS
Justice


Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed May 30, 2012
Publish
[CR25]