**AFFIRMED; Opinion Filed August 13, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

## No. 05-12-00540-CR

**ELIJAH ISAIAH TAYLOR, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause No. F11-40599-K**

## OPINION

Before Justices Bridges, Lang, and Myers
Opinion by Justice Myers

Appellant Elijah Isaiah Taylor was convicted of capital murder for the killing of Adrian Berry, and sentenced to life imprisonment. In three issues, he contends (1) the evidence is legally insufficient, (2) the trial court violated the rule of optional completeness, and (3) the trial court should have charged the jury on the lesser-included offense of felony murder. We affirm.

### BACKGROUND AND PROCEDURAL HISTORY

Dabrawme Gardner testified that she and her family, including her twenty-one-year-old son, Adrian Berry, moved to Dallas County, Texas, from New Orleans in 2005. In December of 2010, Berry was living with his mother Dabrawme, his step-father Michael Lee Gardner, and his six-year-old sister in apartment 162 of the Tri Pointe Square Apartments on Samuell Boulevard in Mesquite, Texas. Both Dabrawme and Michael Gardner suspected that Berry, who often smoked marijuana, sold drugs.

Michael Gardner testified that he last saw Berry at around 10:40 p.m. on the night of December 20, 2010. Approximately ten minutes after Berry left the apartment, Michael heard "anywhere from six to nine" gunshots in "pretty rapid" succession. Dabrawme also recalled hearing "a lot of gunshots around my house." She was not sure of the number but testified "[i]t was a whole lot" and "not like just a random one or two shots."

Upon hearing the gunshots, Michael immediately went to the apartment window and saw a white Nissan Altima backing out of a parking spot and "heading out" of the apartment complex. The vehicle's head lights were turned off. He could not tell how many people were in the car and did not see anyone running to the car. Michael searched the area and found Berry on the other side of the building lying face down on the ground. On cross-examination, Michael added that, as he exited the apartment, he also saw a blue pickup truck speeding out of the driveway on the other side of the building onto Samuell Boulevard.

Devon Elijah Roberts testified pursuant to an immunity agreement with the State that on December 20, 2010, he went to Mesquite to buy "Kush," a more expensive grade of marijuana, from Berry. Roberts was accompanied by his cousin, Anthony Roberts, and Anthony's friend, appellant. Anthony drove the three individuals in what Roberts recalled was a Nissan "Maxima, I believe," that he had borrowed from appellant's girlfriend; appellant sat in the passenger seat. When they reached Berry's Mesquite apartment complex, Anthony and appellant got out of the car, and Roberts moved to the front seat and drove to the area near Berry's apartment. He pulled into a parking space near apartment 162.

Berry was already standing outside of the apartment when Roberts parked the car. He was wearing "basketball shorts, it looked like," and shoes, but was not wearing a hat or shirt. Roberts thought it looked like Berry was "fixing to get dressed." Roberts opened the driver's side door, Berry "stepped in the door" between Roberts and the door, and they exchanged $20

for one gram of "Kush." The next thing Roberts remembered was hearing someone yell "drop out," which means a person is being robbed. Roberts saw Berry running to the back of the car, with Anthony and appellant chasing him. Roberts heard multiple gunshots "instantly." Roberts further testified that the episode happened too quickly for him to see whether Anthony and appellant were armed. Reminded of an earlier statement to the police that he saw Anthony and appellant with guns in their hands, Roberts testified that he saw both Anthony and appellant with guns in their hands. Berry died as a result of a single gunshot wound to the back.

Roberts ducked down inside the vehicle when he heard the gunshots, and then put the car into reverse. As he drove out of the parking lot, Anthony ran in front of the car. Anthony and appellant jumped in the car, and Anthony told Roberts, "[G]o, go, go." Appellant held a chrome revolver in his hand when he got in the car, and Anthony also had a revolver. Devon asked them what was going on. Anthony said he had "blacked out," and appellant said nothing. Roberts, who was on parole, recalled telling Anthony: "I got to get away from y'all, you know. Y'all need to, you know, let me out, man, you know." Roberts insisted he had nothing to do with the robbery and that he did not know Anthony and appellant were going to rob Berry.

Sandra Elisabete Abrieu testified that she had been living at the Tri Pointe Square apartments for six months when these events took place. On December 20, 2010, at around 10:45 and 11:00 p.m., as she walked outside her apartment to put a visitor permit in her guest's car, she saw two men standing on the sidewalk to her left. The taller of the two men wore a light-colored sweatshirt with a hoodie and had a black gun in his hands. The other man wore a darker color, and she could not see whether he had a gun. Within a few seconds, she saw the two men shooting towards Samuell Boulevard at another man who was running from the parking lot down the sidewalk.

Abrieu could not tell "if only one gun was shooting or more than one because it was very quick." She heard four or five gunshots in rapid succession. She hid behind a car to protect herself when the shooting started, and continued watching through the vehicle's windows. The two men fled the apartment complex in a light-colored car that looked like a Nissan Altima. The police arrived shortly after that.

Samuel Arroyo, a security officer at the Tri Pointe Square Apartments, also heard the gunshots. He was patrolling the complex on foot at around 10:45 or 10:50 p.m. on December 20, 2010, when he heard multiple gunshots in a "non-orderly pattern" that, to Arroyo, sounded "like more than one pistol" was being fired. Arroyo immediately took cover and looked south towards Samuell Boulevard. From his hiding place, he saw "the guy who got shot" run cross the street and fall to the ground several seconds later. Arroyo called 911. While he was on the phone with the 911 dispatcher, he saw a blue Chevrolet pickup truck "driving at full speed out of the property." He went over to the shooting victim and was standing near him when the first police officer arrived approximately five to seven minutes later.

The lead officer on the case, Arthur Daniel Keele of the Mesquite Police Department, testified that he initially identified a man named Steve Skillern as a suspect. Skillern supplied Berry with "Kush" (by mail) and had come from California to visit Berry at the time of the offense. He was listed in Berry's cell phone as "Steve Money," and Berry's phone records showed missed calls as well as a text message from Skillern to Berry saying, "What up, bro? I'm out here," shortly after the 911 call. But Keele ruled out Skillern as a suspect because records from one of Skillern's cell phones showed he was three miles away from the crime scene at the time of the first 911 call at 10:50 p.m. Video from a gas station surveillance camera also showed him several miles away shortly before the shooting.

Continuing to examine Berry's cell phone records, Keele focused on the phone number associated with an individual known as "West D," who had been talking to Berry just before the shooting. Information obtained from MetroPCS, the service provider for "West D," showed that the account was listed under the name "Pacc Big," and that the subscriber's date of birth of "9-11-86" was the security question for the account. After obtaining the phone records for the account, another Mesquite police officer called one of the numbers shown on the records for "West D's" phone number and reached the voicemail of a woman named Samantha Roberts. Keele searched the name of Samantha Roberts in the police's computer databases and found that she had a son named Devon Roberts who was born on "9-11-86." The information he acquired during his investigation led Keele to believe Devon Roberts was the "West D" in Berry's phone.

Devon Roberts was brought to the police station for questioning on December 28, 2010. After interviewing Roberts, police officers arrested him for Berry's murder. The information Roberts provided to officers led them to Roberts's cousin Anthony, also known as "Arack," and appellant, also known as "Savage." Police officers arrested Anthony on December 29, 2010, and appellant was arrested at around midnight that same day. Keele filed murder charges against Anthony and appellant. The charges against both men were later refiled as capital murder.

In addition to the testimony from witnesses at the crime scene and testimony from law enforcement officers regarding the investigation, two witnesses testified that they heard appellant talk about robbing and shooting someone. Lonnie Marsalis Griffin, incarcerated at the time of appellant's trial on unrelated drug charges, testified that he dated appellant's sister and was living with her when he met appellant in November of 2010. He testified that appellant spent time at their apartment and went with him to deliver drugs. When appellant came to stay with them shortly before the 2010 Christmas holiday, Griffin thought appellant was "hiding out," and he "asked him about it." Griffin testified:

He told me he had did something bad and, then, I was, like, all right. I would like—he ain't wanted to talk to me in front of his sister so we had took a ride. We had went to Oak Cliff, and on the way to Oak Cliff he had told me what happened. He told me that he had tried to rob someone and in the process the fella got shot, but at the time he did not know if the fella——I mean, if the person had got killed or not. He was just, like, they had robbed him and they shot him, and he ain't know if he got killed or not.

Griffin also testified that he discussed this issue with appellant again after he discovered the police were looking for appellant and had searched the home of appellant's sister. Griffin explained that a friend, Tyrone Brown, was present when this conversation took place. According to Griffin, appellant provided the following details regarding the offense:

He said they went to—he said, umm—Arack's cousin had just got out of jail and he was in need of some money, and he said he had—he had somebody they can rob or whatever, and Arack called him and they all teamed up to do it. They used —they used—I can't think of her name right night now——they used the car. They used Cheyann's car. That's her name. They went over to Teela's apartment and asked Cheyann could they use the car for a dime sack of marijuana, and she told them, okay. They went to Mesquite. They drove to Mesquite, and when they got to Mesquite, whoever the dude was that they was looking for, he wasn't answering the phone, so they had rode around the apartments and they ended up running into him, and when they ran into him he came up to the car, and as he came up to the car they was talking, and that's when they commenced to rob him, and the—the dude, he had took off running and——Elijah had took off running after him and grabbed him, and they started scuffling, and the dude broke free of the scuffling. He said he had shot. He didn't know if he killed him or not. He said he had shot though. He had shot. Arack had shot, also, and he said the dude ran around the corner and they didn't follow him around the corner because they didn't know if he had a gun on him or not, and they got back in the car and took off.

Griffin further testified that appellant told him the initial plan was to rob someone in Mesquite of marijuana. But it never made sense to Griffin that appellant and the other man, who Griffin identified as "Arack," would plan to rob someone of marijuana because "a pound of marijuana is not a lot of money in it." Griffin then told the jury:

They had—I guess, out on the run, the plan was to rob him in the apartment. The plan was to go into the apartment and rob him in the apartment and just take what he had and run, but—but he—I guess the guy probably, kind of, felt that it was going to happen, so, he wouldn't answer the calls. They had rode around the apartments and they looked for him, and when they looked for him the plan was

–6–

to talk to him and get him outside at the car. They wasn't—I don't believe they wanted to kill him, at first, but they plan was to, you know, like take him into the apartment and rob him and get what he had, but it didn't go that way.

Griffin added that appellant told him he fired his weapon at the victim and thought he had hit him because of their close proximity, and that, after the offense, appellant tried to throw the gun off of Interstate 35 into the Trinity River.

Another witness, Tyrone Dorsey Brown, testified that he was a childhood friend of Griffin and that he met appellant through Griffin. Brown testified that he first "heard about it" from Griffin. Later, when Brown was in the car with Griffin and appellant, appellant stated that he and "Arack" attempted to rob and then shot at "the dude": "Him and Arack was out of the car and the dude walked up, and the dude—they started tussling. The dude got away and was running, and they started shooting, and that was it." Brown added: "He didn't know if he had hit him. He didn't say—he just said they shot. He didn't say if he hit him or if Arack hit him. He said they were shooting." Brown also testified that he knew appellant had a .38 revolver because he had "seen it before."

When recalled by the defense, Roberts was questioned regarding alleged inconsistencies between his trial testimony and his earlier statements to the police. Roberts testified he did not remember telling the police "I don't want to go to prison, what can I tell you?" He also denied telling the police that he wanted to be a "good witness" for them in this case; denied telling them he wanted to help the State because he had "messed up;" and denied telling the prosecutor he was "not going to give all and get nothing . . . in return." Roberts also testified he did not recall giving police officers several different accounts of what happened. After defense counsel showed Roberts "some of the videos" outside the presence of the jury to refresh his memory,[1] Roberts testified he did not recall much of his interview with the police because, at the time, he

---

[1] These events are discussed in more detail in appellant's second issue.

was high on marijuana "and nervous and scared at the same time." The trial court subsequently admitted, and the jury was shown, portions of interviews Roberts gave to the police on December 29, 2010, and to the prosecutor and two detectives on October 22, 2011, during which Roberts implicated his cousin, Anthony, and appellant in the shooting.

The defense also recalled Keele, who acknowledged that Roberts initially provided officers with a different version of events. According to Keele, Roberts first stated he was not even there and did not know what Keele was talking about, and then said he was there but nobody else was with him. Roberts then told Keele that he was there when two random individuals came up and started shooting, and he did not know who they were. It was not until Keele stepped outside with Roberts to take a "smoke break" that Roberts started providing officers with his "final version of what happened." But Keele testified that there was no recording of this conversation because it occurred while the two of them were outside of the interview room. On cross-examination, Keele testified that it is not uncommon for people to lie during police interviews and that people commonly mitigate their own involvement and that of people related to them even after they start telling the truth. In that regard, according to Keele, Roberts was no different than any other person Keele had interviewed.

At the conclusion of the evidence, the jury found appellant guilty of capital murder, and the trial court sentenced appellant to life imprisonment.

### DISCUSSION

#### *Sufficiency*

In his first issue, appellant contends the evidence is legally insufficient to support the capital murder conviction because the State failed to prove beyond a reasonable doubt that appellant committed the offense.

When an appellant challenges the sufficiency of the evidence to support a conviction, we

review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id*. We presume the jury resolved all conflicts in the evidence in favor of their verdict. *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). This standard is the same for both direct and circumstantial evidence. *Id*. In conducting a sufficiency review, we defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012).

The indictment in this case alleged that on or about December 20, 2010, appellant did "unlawfully then and there intentionally cause the death of ADRIAN BERRY, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, and the defendant was then and there in the course of committing and attempting to commit the offense of ROBBERY of said deceased."

A person commits capital murder if the murder is committed in the course of committing or attempting to commit one of the statutorily-enumerated offenses, including robbery. *See* TEXAS PENAL CODE ANN. § 19.03(a)(2). A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he "intentionally, knowingly, or recklessly causes bodily injury to another" or "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id*. § 29.02(a)(1), (2).

The court's charge authorized the jury to convict appellant on either of two theories of capital murder: (1) as a party under section 7.02(a)(2) of the Texas Penal Code, and (2) as a

–9–

conspirator under section 7.02(b).  Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."  *Id.* § 7.01(a).  A person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."  *Id.* § 7.02(a)(2).  The penal code further provides:

> If, in an attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).

A person can be found guilty of capital murder as a conspiring party under section 7.02(b).  *See Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992); *Pollard v. State*, 392 S.W.3d 785, 801 (Tex. App.—Waco 2012, pet. ref'd); *Demus v. State*, No. 05–09–00175–CR, 2010 WL 277092, at *3 (Tex. App.—Dallas Jan. 26, 2010, pet. ref'd) (not designated for publication).  If the evidence demonstrates that the defendant conspired with others to commit robbery and, during the robbery, one of the co-conspirators commits capital murder, the defendant can be held criminally responsible for the capital murder if it was in furtherance of the conspiracy's unlawful purpose and should have been anticipated.  *See Longoria v. State*, 154 S.W.3d 747, 755 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *Pollard*, 392 S.W.3d at 801; *Rattler v. State*, No. 05–08–01020–CR, 2010 WL 2044880, at *5 (Tex. App.—Dallas May 25, 2010, no pet.) (mem. op., not designated for publication); *Demus*, 2010 WL 277092, at *3.  Additionally, evidence a defendant knew his co-conspirator might use a gun in the course of committing a robbery has been held sufficient to demonstrate that the defendant should have anticipated a murder could occur during the commission of the robbery.  *See Longoria*, 154

S.W.3d at 756–57; *Pollard*, 392 S.W.3d at 801; *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Demus*, 2010 WL 277092, at *3.

The court's charge also instructed the jury to determine whether Roberts was an accomplice witness, and applied the law of accomplice witness testimony. When, as in this case, the jury was charged that it could find a certain witness an accomplice as a matter of fact (i.e., Roberts), we may assume for the sake of our analysis that the jury concluded the witness was an accomplice, and assess the adequacy of the corroborating evidence excluding that testimony. *See Smith v. State*, 332 S.W.3d 425, 447–48 (Tex. Crim. App. 2011) (excluding testimony of accomplice as a matter of fact and concluding remaining evidence was sufficient to tend to connect defendant to the murders under Texas Code of Criminal Procedure article 38.14); *Yost v. State*, 222 S.W.3d 865, 874 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) ("Even if one assumes the jury found Bridget to be an accomplice, her testimony is amply corroborated."); *see also Bulington v. State*, 179 S.W.3d 223, 230 (Tex. App.—Texarkana 2005, no pet.) ("Even if Tate could be found to have been an accomplice, there is sufficient evidence tending to connect Bulington to the murders.").

Appellant argues that the witnesses who identified him as one of the perpetrators lacked reliability and credibility. He points out that Roberts testified under a grant of immunity from the State and had an extensive criminal history. Griffin also had a lengthy criminal history and, at the time of trial, was charged with first-degree felony possession with the intent to deliver 400 grams or more of cocaine. Griffin acknowledged that he contacted the prosecutor in this case because he hoped to reduce his sentence in the drug possession case, where the State had recommended a sentence of ten years' confinement. Appellant also argues that Brown, who partially corroborated Griffin's testimony, was Griffin's childhood friend.

As the judge of the weight and credibility of the evidence, however, the jury was free to reject such assertions. We must presume the jury resolved the conflicting inferences in favor of the prosecution and defer to that resolution. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 326). Viewing the evidence in the light most favorable to the verdict, the State presented legally sufficient evidence from which the jury could rationally find all of the elements of capital murder beyond a reasonable doubt. The jury could also conclude the non-accomplice evidence tended to connect appellant to the offense. Griffin testified appellant told him about the plan to commit the robbery, and that appellant admitted to chasing and shooting at Berry. Brown likewise testified he was in the car with Griffin and appellant when appellant stated that he and "Arack" attempted to rob, and then shot at, "the dude." From the evidence presented, the jury could conclude beyond a reasonable doubt appellant and Anthony planned to rob Berry, and that they accompanied Roberts to the Tri Pointe Square Apartments to carry out that plan. In addition, the jury could reasonably conclude appellant anticipated, or should have anticipated, the possibility that a murder could occur. *See Longoria*, 154 S.W.3d at 756–57. Accordingly, the evidence in this case is legally sufficient to support appellant's conviction as a conspirator under the law of parties. We overrule appellant's first issue.

### *Rule of Optional Completeness*

In his second issue, appellant argues that admitting and publishing to the jury only a portion of his videotaped October 2011 interview—without showing the jurors the entire interview—violated the rule of optional completeness.

At trial, after the defense recalled Devon Roberts, defense counsel cross-examined him regarding statements he made during the interview with the Mesquite police on December 29, 2010, as well as statements he made during the hour-and-fifteen-minute-long October 11, 2011

interview with the prosecutor and two Mesquite police detectives. While Roberts testified that he remembered some of what he told the officers, he said he did not remember many of the statements. After appellant's trial counsel showed Roberts "some of the videos" out of the jury's presence to refresh his memory, Roberts testified, as discussed earlier, that he did not remember much of "the interview" because he was high on marijuana "and nervous and scared at the same time."

On redirect, the State questioned Roberts as follows:

Q. [PROSECUTOR:] Devon, I'm going to show you what has been marked as State's Exhibit Nos. 40 and 41. Forty being an interview from October the 11th of 2011 where I have shown you the time from 44:44 to 49:22. Do you remember watching that with me?

A. [ROBERTS:] Yes.

Q. Okay. Is that everything on that video just how you remembered it whenever we interviewed you?

A. Yes.

Q. Okay. State's Exhibit 41 is an interview from December the 29th, 2010 from the Mesquite Police Department, the second night or the second day that you were there? Do you remember watching a clip from 5 minutes to 8 minutes and 18 seconds?

A. Yes.

Q. Okay. Is that you on that clip?

A. Yes.

The prosecutor then offered State's exhibit 40, the video recording of Roberts's October 2011 interview, and asked to publish to the jury the portion of the interview from 44 minutes and 45 seconds to 49 minutes and 2 seconds. He also offered State's exhibit 41—the five minute excerpt of the December 2010 interview. The prosecutor told the trial court when he offered State's exhibit 41 that he was offering the exhibit for the limited purpose of rebutting the theory that Roberts fabricated his testimony at trial because he was testifying under an immunity

–13–

agreement. Defense counsel replied, "We have no objections, but under the Rule of Optional Completeness, we would ask that the whole video be shown." The trial court admitted the exhibits but denied the defense's request to "offer all of it," and then granted the State permission to publish "[j]ust those sections" of the video the State had specified.[2]

At the beginning of the October 11, 2011 interview, the prosecutor stated that he had met with Roberts "last Monday" at the office of Roberts's parole officer, and that, after being served with a subpoena, Roberts told the prosecutor he intended to "plead the fifth." The prosecutor further explained that, following that meeting, Roberts's situation had changed, and Roberts was charged and booked into the Dallas County Jail. The prosecutor then told Roberts he had been contacted by Roberts's girlfriend, and that the prosecutor understood from that telephone call that Roberts was now interested in "being a witness" if the charges against him would "go away." Roberts replied he was interested in talking to the prosecutor and the detectives "if the stipulations are right." One of the detectives then read Roberts the *Miranda* warnings. Roberts indicated he understood his rights, and then proceeded to speak with the prosecutor and the officers.

---

[2] When she invoked the rule of optional completeness, defense counsel did not specify whether she was referring to State's exhibit 40, exhibit 41, or both. But though her request was imprecise, we conclude it would have been understood by the trial judge, viewed in context, as a request to publish the entirety of State's exhibit 40. *See Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005) (to preserve error for appeal, party must "let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."). The relevant portion of the record reads as follows:

> [PROSECUTOR]: At this time the State offers State's Exhibit Nos. 40 and 41. Forty being the interview from October 11th of 2011. It is the entire interview, but we're only talking about from 44 minutes to 45 seconds to 49 minutes and 2 seconds.
> State's Exhibit 41 is a clip of the interview from December the 29th, 2010, from 5 minutes and 18 seconds for the limited purpose of rebutting the fact that the Defendant's witness is fabricating his testimony today because he is under an immunity agreement.
> (State's Exhibit Nos. 40-41 Offered.)
> [DEFENSE COUNSEL]: We have no objections, but under the Rule of Optional Completeness, we would ask that the whole video be shown.
> [PROSECUTOR]: I'm only offering—
> THE COURT: Excuse me? It's admitted, but your request to offer all of it is denied.
> (State's Exhibit Nos. 40-41 Admitted.)
> [PROSECUTOR]: Permission to publish to the jury, Your Honor.
> THE COURT: Go ahead. Just those sections.

–14–

Roberts, however, was upset because he believed the child endangerment charges that had been brought against him were unfounded. He told the prosecutor and the detectives he had "seen the shooter," but he was reluctant to discuss the shooting in detail without assurances the pending charges would be resolved. He also told them he was hesitant to talk about his cousin, who he had grown up with. The prosecutor and the detectives repeatedly told Roberts he could not have "any deals" without first talking to them. At several points before the excerpted portion of the interview, Roberts made contradictory statements, and the prosecutor and the detectives accused Roberts of not being truthful; they urged him to tell them what actually happened. During the part of the interview that was played for the jury, Roberts implicated his cousin, Anthony, and appellant in the shooting. Then, after Roberts gave the statement that was played for the jury, the prosecutor and the detectives asked him about an account given by other witnesses that Roberts was the one who planned the robbery, and they asked Roberts if this is what really happened—which Roberts denied. At one point toward the end of the interview, one of the detectives said to Roberts: "What we're trying to figure out right now is which—which version do we believe? Which—which one of these stories do we believe now? Obviously, the last one you just told—there's a lot more detail there." Roberts replied, "The only thing that I didn't say—that I didn't want to say—is that I seen my cousin, and that he had a gun."

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Walters*, 247 S.W.3d at 217; *Montgomery v. State*, 810 S.W.2d 372, 390–92 (Tex. Crim. App. 1991) (op. on reh'g).

Texas Rule of Evidence 107, the rule of optional completeness, states in part:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole *on the same subject* may be inquired

–15–

> into by the other, and any other act, declaration, writing or recorded statement which is *necessary to make it fully understood or to explain the same* may also be given in evidence, as when a letter is read, all letters on the same subject between same parties may be given.

TEX. R. EVID. 107 (emphasis added). "The plain language of Rule 107 indicates that in order to be admitted under the rule, the omitted portion of the statement must be 'on the same subject' and must be 'necessary to make it fully understood.'" *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004). The rule's purpose is to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing. *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011) (quoting *Walters*, 247 S.W.3d at 218). Rule 107 is not invoked by mere reference to a document, statement, or act, but rather, to be admissible under the rule, the omitted portion of the statement must be (1) on the same subject referenced by the other party and (2) necessary to make the previous offer of the other party fully understood. *Pena*, 353 S.W.3d at 814 (quoting *Sauceda*, 129 S.W.3d at 123). Rule 107 is limited by rule 403, which permits a trial judge to exclude otherwise relevant evidence if its unfair prejudicial effect or its likelihood of confusion of the issues substantially outweighs its probative value. *Walters*, 247 S.W.3d at 218; *see* TEX. R. EVID. 403.

Applying rule 107, the initial requirement, that some part of the evidence sought to be admitted in whole or in part must be admitted by the opposing party, was satisfied here because the State published a five minute portion of the interview. *See* TEX. R. EVID. 107. As for the other requirements of the rule, appellant's argument that the remainder of the interview was necessary to make the published portion "fully understood" is based on Roberts's demeanor during the interview, the inconsistencies in his statements, and attempts by law enforcement officers to get Roberts to be truthful. But the defense's only argument to the trial court was that the *entire* video should be shown to the jury. It made no argument or showing that a specific portion of the interview should be shown to the jury, nor that the unpublished portion of the

–16–

interview was necessary to fully understand or explain the portion seen by the jury. In addition, State's exhibit 40 includes discussion of unrelated possession of marijuana and child endangerment charges that were pending against Roberts at the time of the interview. The trial court could have concluded that the references in the full interview to these extraneous offenses would likely create confusion. *See Sauceda*, 129 S.W.3d at 121–24 (when defendant asked CPS worker one question for impeachment purposes (whether the child victim mentioned a weapon in an interview), the State could not offer videotape of entire interview (which revealed extraneous offenses) under rule of optional completeness).

Appellant argues that the portion of the interview heard by the jury was incomplete or misleading because the jury could have been led to believe Roberts "simply gave a statement about the offense without a great deal of coaxing by the prosecution." The defense, however, cross-examined Roberts regarding his criminal history and the inconsistencies between his trial testimony and his prior statements to the police. Roberts denied remembering most of the prior statements, but the defense's detailed cross-examination gave it ample opportunity to show Roberts was a reluctant witness who had not been entirely forthcoming or cooperative during the investigation. Indeed, the State acknowledged at trial that Roberts had been originally charged in this case. The jury heard Roberts testify that he did not want to be in court, that he preferred to exercise his Fifth Amendment right, and that the State was only able to secure his testimony by offering him immunity.[3] Therefore, contrary to appellant's argument, the record does not show

---

[3] Roberts testified on direct as follows:

> Q. [PROSECUTOR:] All right. Let me back up here. You are here today to testify under an immunity agreement; is that correct?
> A. [ROBERTS:] Yes.
> Q. Okay. You have got a lawyer here in this courtroom?
> A. Yes.
> Q. All right. You don't want to be here; is that right?
> A. Right.
> Q. In fact, the State—whenever we subpoenaed you, you indicated to us you were going to plead the Fifth on this case; is that right?
> A. Right.

that the remainder of the October 2011 interview was necessary to reduce the possibility of the jury receiving a false impression. *See Pena*, 353 S.W.3d at 814. Based on the record before us, we conclude the trial court's denial of appellant's rule 107 objection was not an abuse of discretion. We overrule appellant's second issue.

### Jury Charge Error

In his third issue, appellant argues the trial court erred by denying appellant's request to instruct the jury in the guilt-innocence charge on the lesser-included offense of felony murder.

Our first duty in analyzing a jury charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). If we find error, we analyze that error for harm. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* If error occurred and appellant objected at trial, we determine whether the error was "calculated to injure" the appellant's rights, which means there must be "some harm" to the accused resulting from the error. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (citing *Almanza v. State*, 686 S.W.2d at 157, 171 (Tex. Crim. App. 1985)).

To determine whether the lesser-included offense instruction requested by appellant should have been given, we follow a two-step analysis. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993); *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981) (plurality op. on reh'g). The first step asks whether the lesser-included offense is included

---

Q. You were actually charged at some point and then released because our office doesn't accept the charges; is that correct?
A. Yes, sir.
Q. And, then, just through the way everything has gone—and this is part of your family, you want to plead the Fifth?
A. Yes, sir.
Q. And the State offered you immunity and you understand that since you've been offered immunity, you have no more Fifth Amendment rights; is that correct?
A. Yes, sir.
Q. And so anything you say here today could never be used against you; is that correct?
A. Yes, sir.

within the proof necessary to establish the offense charged. *McKithan v. State*, 324 S.W.3d 582, 587 (Tex. Crim. App. 2010). We compare the statutory elements and any descriptive averments in the indictment for the greater offense with the statutory elements of the lesser-included offense. *Ex parte Amador*, 326 S.W.3d 202, 206 n.5 (Tex. Crim. App. 2010); *Ex parte Watson*, 306 S.W.3d 259, 263 (Tex. Crim. App. 2009); *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.09. This step is a question of law. *Hall*, 225 S.W.3d at 535.

The second step is to determine if there is some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of only the lesser-included offense. *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006); *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). The evidence must establish the lesser-included offense as "a valid rational alternative to the charged offense." *Segundo v. State*, 270 S.W.3d 79, 91 (Tex. Crim. App. 2008); *see also Rice v. State*, 333 S.W.3d 140, 146 (Tex. Crim. App. 2011). We review all of the evidence presented at trial. *Hayward v. State*, 158 S.W.3d 476, 478–79 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 673. Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). In determining whether the evidence raises the requested lesser-included offense, we do not consider the credibility of the evidence or whether it conflicts with other evidence. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).

Here, only the second step of the analysis is in dispute. The State charged appellant with, and the trial court instructed the jury on, capital murder in the course of a robbery. The trial court denied appellant's request for a felony murder charge. Because felony murder is a lesser-included offense of capital murder committed in the course of a robbery, the first part of the analysis is satisfied. *See Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999); *see also*

–19–

TEX. PENAL CODE ANN. §§ 19.02(b)(3) & 19.03(a)(2).

Turning to the second step, we examine whether some evidence would permit a rational jury to find appellant guilty of felony murder rather than capital murder. A person commits capital murder if he intentionally causes the death of an individual while in the course of committing or attempting to commit a robbery. TEX. PENAL CODE ANN. § 19.03(a)(2); *Johnson*, 853 S.W.2d at 535. A person commits felony murder if he:

> Commits or attempts to commit a felony, other than manslaughter, and in the course of or in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3); *Murphy v. State*, 665 S.W.2d 116, 119 (Tex. Crim. App. 1983). The difference between capital murder and felony murder is that capital murder requires the specific intent to kill, and felony murder requires only the intent to commit the underlying felony. *See Fuentes*, 991 S.W. 2d at 272 ("The distinguishing element between felony murder and capital murder is the intent to kill."); *Santana v. State*, 714 S.W.2d 1, 9 (Tex. Crim. App. 1986) ("The only difference in the two offenses is the culpable mental state. In capital murder, there must be an intent to kill, while in the felony murder, there must only be an intent to commit the underlying offense, in this case robbery."). As a result, in order for appellant to be entitled to a felony murder instruction, the record must contain some evidence that would permit a rational jury to find appellant intended to commit a robbery but unintentionally caused Berry's death by committing an act clearly dangerous to human life. *See Hines v. State*, No. 01–11–00725–CR, 2012 WL 5458424, at *3 (Tex. App.—Houston [1st Dist.] Nov. 8, 2012, pet. ref'd) (mem. op., not designated for publication).

Appellant argues Lonnie Griffin's testimony entitled him to an instruction on felony murder because Griffin's testimony showed he was under the impression, based on what appellant told him, that the parties intended only to rob Berry, and that they did not have the

intent to kill him. But Griffin's testimony does not show appellant never had the intent to kill Berry, only that he told Griffin the initial plan involved robbing Berry. We determine intent to kill not when the robbery plan was devised but when appellant and Anthony shot Berry. *See Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim. App. 2001); *Butler v. State*, No. 05–11–01051–CR, 2012 WL 3104680, at *4 (Tex. App.—Dallas July 31, 2012, no pet.) (not designated for publication).

The evidence in this record concerning appellant's intent at the time of the shooting "does not accord with robbery alone." *Butler*, 2012 WL 3104680, at *4. Dabrawme Gardner, Michael Gardner, Sandra Abrieu, Samuel Arroyo, and Devon Roberts all testified to hearing multiple gunshots fired on the night in question. Griffin testified that appellant told him he fired his gun at the victim and thought he had hit him due to their close proximity. Intent to kill can be inferred from use of a deadly weapon in a deadly manner. *See Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); *Butler*, 2012 WL 3104680, at *4. Given the evidence in this case, a rational jury could not have concluded that, at the time of the shooting, appellant intended to only rob, and not kill, Berry. Accordingly, appellant has not satisfied the second element, and he was not entitled to a jury instruction on the lesser-included offense of felony murder. We overrule appellant's third issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120540F.U05

–21–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ELIJAH ISAIAH TAYLOR, Appellant

No. 05-12-00540-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 4, Dallas County, Texas
Trial Court Cause No. F11-40599-K.
Opinion delivered by Justice Myers.
Justices Bridges and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 13th day of August, 2013.

/Lana Myers/

LANA MYERS
JUSTICE