No. PD-1564-14

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

## LESTER RAY GUY

Petitioner

v.

**The State of Texas**
Respondent

On Appeal In Case Number D1DC 10-302548
From the 331[TH] District Court of Travis County
The Hon. David Crain, Presiding Judge
Third Court of Appeals No. 03-12-00466-CR

# Petition for Discretionary Review

Submitted by:

The Law Offices of Ariel Payan
1012 Rio Grande
Austin, Texas 78701
Tel. 512/478-3900
Fax: 512/472-4102

**Ariel Payan**
State Bar No. 00794430

Court-Appointed Attorney for Petitioner

**Oral Argument Requested**

## Table of Contents

Certificate of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Grounds for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

      **1)    Can an expert discount part of a test as unsound, while relying on another part of the same test, when there are no standards by which he can be held accountable?** . . . . . . . . . . . . . . . . . . . 2

      **2)    The appellate court erred in failing to find that the test relied upon failed to meet the standards of Daubert/ Kelly for reliability to be admissible.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Certificate of Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

i

**Certificate of Parties**

Pursuant to Rule 68, Rules of Appellate Procedure ("Tex.R.App.Pro."), the following is a complete list of the names and addresses of all parties to the trial court's final judgment and their counsel in the trial court, as well as appellate counsel.

**Petitioner**

Lester Ray Guy
TDCJ-ID No. 297393
Clements Unit
9601 Spur 591
Amarillo, TX 79102

Appellate Counsel:                          Trial Counsel:
PDR Counsel:
Ariel Payan                                 Ariel Payan
1012 Rio Grande                             Jon Evans
Austin, Texas  78701

**State of Texas**

Rosemary Lehmberg
P.O. Box 1748
Austin, TX 78767

Appellate Counsel:                          Trial Counsel:
Scott Talliaferro

                                            Jim Young
State Prosecuting Attorney                  Matt Foye
Lisa C. McMinn

ii

# Index of Authorities

**Federal Cases**:

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

**Texas Cases**:

Jordan v. State, 928 S.W.2d 550, 554–55 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . . . 8

Kelly v. State, 824 S.W.2d 568, 572-73 (Tex.Cr.App. 1992) . . . . . . . . . . . . . . . . . . . 3, 7, 8

Reynolds v. State, 204 S.W.3d 386, 390 (Tex.Cr.App. 2006) . . . . . . . . . . . . . . . . . . . . . . 7

Williams v. State, 937 S.W.2d 479, 483 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . . . . 3

## Statement Regarding Oral Argument

Oral Argument is Requested and would assist the Court in deciding this novel confluence of scientific evidence and our criminal laws.

## Statement of the Case

Pursuant to Tex.R.App.Pro. 68.4(d), the following is a brief general statement of the case:

Petitioner, Lester Ray Guy, was charged by indictment with the offense of capital murder, a felony, in Cause No. D1DC 10-302548 in the 331rd District Court of Travis County, Texas. He was convicted in said cause and was sentenced to life. The Court of Appeals affirmed the decision below.

## Statement of Procedural History

Pursuant to Tex.R.App.Pro. 68.1(d), Petitioner would show the following:

The Third Court of Appeals denied Petitioner's appeal on October 22, 2014.

Motion for rehearing and reconsideration was filed and denied on December 11, 2014.

The Third Court of Appeals has decided an important question of state and federal law that has not been, but should be, settled by this Court.
The Third Court of Appeals has misapplied a statute in deciding this case.

iv

**Grounds for Review**

Pursuant to Tex.R.App.Pro. 68.4(f), the following are the reasons this petition should be heard

1)      **Can an expert discount part of a test as unsound, while relying on another part of the same test, when there are no standards by which he can be held accountable?**

2)      **The appellate court erred in failing to find that the test relied upon failed to meet the standards of Daubert/ Kelly for reliability to be admissible.**

No. PD-1564-14

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

## LESTER RAY GUY
Petitioner

v.

**The State of Texas**
Respondent

On Appeal In Case Number D1DC 10-302548
From the 331TH  District Court of Travis County
The Hon. David Crain, Presiding Judge
Third Court of Appeals No. 03-12-00466-CR

# Petition for Discretionary Review

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW, Lester Ray Guy, Petitioner in the above styled and numbered cause, by and through Ariel Payan, his undersigned attorney of record, and respectfully files this "Petition for Discretionary Review," filed pursuant to Tex.R.App.Pro. 68.

1

1) **Can an expert discount part of a test as unsound, while relying on another part of the same test, when there are no standards by which he can be held accountable?**

The State's experts testified that the DNA test used in this case were effective, reliable, and widely used, especially in cases where DNA has degraded or is of low quantity, despite the fact that it targets only eight of the fifteen loci targeting by the regular STR test. The State's experts also testified that this test had not been validated by the lab that conducted the analysis, and they could not say what the minimum standards were for an appreciable return, or what standards had to be followed when, as happened here, there was an issue regarding one of the loci. The test conducted was consistent with Appellant in seven loci, at the eighth the State's experts discounted their findings. Appellant did not match at this location and had it been included Appellant would have been excluded as a suspect.

The test used had not been validated through the lab's own internal testing regime. The validation had begun over a year prior to Appellant's trial, but at the time of trial the State's experts testified that the validation report was still ongoing. Without the completion of the study there was no standard by which the State's expert could discount the return at the non conforming loci.

A trial court's responsibility is to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. See, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Kelly v. State, 824 S.W.2d 568, 572-73 (Tex.Cr.App. 1992). The appellate court's duty is to act as a due process safeguard ensuring only the rationality of the jury in reviewing the evidence presented. Williams v. State, 937 S.W.2d 479, 483 (Tex.Cr.App. 1996).

The instant case involves the rape and murder of Hazel Ivy in 1978. An autopsy was done and slides were developed from oral, anal and two vaginal swabs. These slides were dyed and placed under glass, then stored in the coroners office in an unrefrigerated box for twenty two years, until collected by Austin Police. (R.R. Vol. 3, pg. 13). In 2001 DPS did a test of the Vagina 1 slide, and got a return at 3 loci. (R.R. Vol. 3, pg. 15). Further testing was not done until 2008 by Orchid Cellmark.

The State called Huma Nasir, a DNA forensic analyst at Orchid Cellmark in Dallas. Nasir testified that she was hired to test DNA samples using a new testing protocol known as miniFiler-STR. (R.R. Vol. 7, pg. 305). Whereas Profiler and Identifiler STR test kits test 15 loci, and require a larger genetic sample to test, miniFiler-STR looks only at 8 of these same loci, plus the ameloginin (sex marker) and requires a much smaller amount of genetic material to create a return. (R.R. Vol. 7, pg. 138). The FBI and CODIS databases are based upon the 15 STR loci, and require anywhere from 13 to 15 loci at a minimum to run a search. (R.R. Vol. 7, pg. 311). Orchid began testing miniFiler back in 2008 and began doing

3

feasability and validation studies on the product at that time. (R.R. Vol. 7, pg. 141). The miniFiler manufacturer had validated their test kit for 500 picograms, as an optimum amount of genetic material. (R.R. Vol. 7, pg. 160). The manufacturer validated a full volume reaction at 25 micro liters of genetic material. Id. At the time of trial Orchid was still doing studies on the product. Orchid had completed a stochastic threshold study in 2011, studying the allelic drop out in small or degraded samples. (R.R. Vol. 7, pg. 143). These stochastic studies were done with 250 picograms of genetic material as a testing standard. (R.R. Vol. 7, pg. 157-158). They had also internally validated using half the 25 micro liter volume required by the manufacturer of miniFiler. (R.R. Vol. 7, pg. 161). When the test in this case was run, Orchid had not completed the validation of this stochastic study, and at the time of trial, Nasir was still working with the lab director to try and determine what the stochastic threshold should be when reviewing results. (R.R. Vol. 7, pg. 149). Nasir testified that they had done a study on the peak height ratio for miniFiler and determined it to be 100 RFU's, but the Orchid lab director had wanted to do additional studies after reviewing it. (R.R. Vol. 7, pg. 150-151). All of these internal validation studies, to allow the company to process and test below the manufacturers recommended test protocols, are not peer reviewed in any way, they are not published nor verified by anyone not working for the company. (R.R. Vol. 7, pg. 161).

Dr. Laurence Mueller, Professor at University of California at Irvine, was called by the defense to testify regarding the DNA testing in this case. (R.R. Vol. 8, pg. 101). Mueller did

4

not agree with the analysis regarding the allelic drop out of the FGA allele. (R.R. Vol. 8, pg. 106-7). Mueller testified that this sample was amplified and tested twice, and in both the FGA showed only a 19. Id. In normal STR testing a homozygote return is usually indicated by a higher than normal peak height compared to the rest of the sample. (R.R. Vol. 8, pg. 106). That determination cannot be made so simply in a miniFiler test, because the peak heights vary so much within a single sample so traditional stochastic modeling is not effective. Id.

In addition, Mueller stated that there are a lot of allelic drop out studies ongoing to try and answer this exact question of how frequent the drop out occurs in miniFiler testing of degraded samples. (R.R. Vol. 8, pg. 107). These tests would be moot if a scientist could, just look at the data and cast out a loci because it did not match a suspect sample. Id. Mueller testified that the generally accepted stochastic threshold for DNA labs is 100 RFU's, the same standard that Nasir testified about for Orchid. (R.R. Vol. 8, pg. 108). This means that if a peak height is above this threshold a lab can feel confident that they have a viable return at that loci, and that they have a very low chance of allelic dropout, whereas below that stochastic threshold allelic dropout is much more likely and becomes a bigger concern in the testing. (R.R. Vol. 8, pg. 109).

Mueller testified that this issue is critical for the jury to understand because if there was no allelic dropout then Appellant is excluded as the contributor of the suspect DNA. (R.R. Vol. 8, pg. 113). Mueller said that the way an expert determines whether or not dropout has

5

occurred is to look to the electropherogram readings. If you look at the returns and it shows some return at a particular location then you may have allelic dropout. Id. But, as he testified, if you have as was shown here a very nice peak, 357 RFU's, at 19 and then you don't see any return, at all, at the 23 allele location, not even a hint at the 20 to 50 RFU scale then you know you don't have any indication of allelic dropout. (R.R. Vol. 8, pg. 113-114 & 116-117).

Mueller then compared the DPS lab returns on the vagina 1 sample done back in 2001, at the FGA location to Orchid's returns on the vagina 2 slide at the same loci. Both labs, in separate tests at separate times had a 19 return at the FGA loci, neither indicated an allele at 23. (R.R. Vol. 8, pg. 117). Mueller reviewed the raw data and electropherograms from the DPS 2001 DNA test on vagina slide 1. Mueller testified that there were some irregularities on the epithelial cell fraction tests, and the DPS analyst noted this and discounted the E cell fraction DNA testing. (R.R. Vol. 8, pg. 119). When DPS conducted the DNA testing on the sperm cell fraction no such notes were made and the returns generated results, which DPS, APD and Orchid used in their investigation. Id. The DPS results showed only a 19 at the FGA location and the lab summized that the suspect was a homozygote at FGA (19, 19). (R.R. Vol. 8, pg. 119-120).

Mueller then discussed another loci from the DPS report. The DPS report showed that the vagina 1 slide at D21 returned alleles at position 29, 30. (R.R. Vol. 8, pg. 120). Appellant's D21 loci is 30, 31. Id. A return which would exclude Appellant as a suspect.

6

Mueller discussed the ongoing research issues with allelic dropout in the scientific community. (R.R. Vol. 8, pg. 128 et seq.). Muller testified that if you have to look at a defendant to determine whether allelic dropout has occurred, as was done here, then you are no longer doing science, you are adjusting your results to meet your suspect profile. (R.R. Vol. 8, pg. 128). Scientists are also working on how to include this allelic dropout probability into the mathematical calculations so as to give better, more accurate and truthful results. Id.

Scientific testimony must be both reliable and relevant in helping the jury reach a conclusion in a case. Kelly, 824 S.W.2d at 572; see Daubert, 509 U.S. 579. Under Kelly, scientific evidence must meet three criteria to be considered sufficiently reliable as to be of help to a jury: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. Reynolds v. State, 204 S.W.3d 386, 390 (Tex.Cr.App. 2006). The test used here by Orchid did not meet these criteria. Validity is a core requirement of Daubert/Kelly, and those internal validity tests which would allow the lab to testify about a reduced and degraded sample size had not been completed.

The appellate court failed to apply the proper standard of review in this case. In holding that the jury was free to believe whomever they wanted, as much or as little, the appellate court failed to hold the state, as proponent of the evidence

7

**2)      The appellate court erred in failing to find that the test relied upon failed to meet the standards of Daubert/ Kelly for reliability to be admissible.**

A trial court's responsibility under Texas Rule of Criminal Evidence 702 is to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. See, e.g., Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Kelly v. State, 824 S.W.2d 568, 572-73 (Tex.Cr.App. 1992); Jordan v. State, 928 S.W.2d 550, 554–55 (Tex.Cr.App. 1996). The proponent of the scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable. This is accomplished by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory; and (3) proper application of the technique on the occasion in question. Kelly, 824 S.W.2d at 573.

In the instant case, the defense challenged the admissibility of two experts opinions. The defense challenged the admissibility of the miniFiler STR test, through Huma Nasir, and the opinion of Ranajit Chakraborty dealing with the statistical analysis from his report. Appellant adopts those sections entitled Orchid Cellmark Test and Dr. Ranajit Chakraborty from the legal sufficiency point of error, supra, for this point of error.

The miniFiler test kit as validated by the manufacturer required more than three times the material used to test in this case. In addition, it required more than twice the volume of testing material after amplification as was used here. The validation and studies done by Orchid were not peer reviewed, nor do they contain an error rate determination. In addition,

Orchid had not even completed their stochastic threshold study prior to testing or even prior to trial. Without an objective stochastic threshold it is left entirely to the analyst to determine whether or not a loci return is valid. Orchid had initially declared that threshold to be 100 RFU's but had later pulled that threshold, but still continued to run their tests without a standard protocol for analyzing their results. Nothing exemplifies this problem better than the issue that was created in this case by the FGA loci. If the threshold was 100 RFU's then the FGA result in this case excludes Appellant as a suspect because it was over that threshold and there was no other standardized indicator that would indicate that there was allelic dropout (no peak at all at the FGA 23 location). But since there is no stochastic threshold the State's experts could ignore that loci and thereby include Appellant.

Chakraborty's testimony deals with these same issues and his opinion is again based on the same lack of validated standards in the Orchid tests. The State experts discount the need for a stochastic threshold, yet they both rely upon and discuss a threshold finding as part of making their determinations that the other 7 alleles are valid. Indeed, Nasir runs a whole second test because the first test did not return result above 'the threshold' that she then later says she doesnt have. (R.R. Vol. 7, pg. 154). Chakraborty's testimony in agreeing with and relying upon the Orchid results is thereby tarred with the same problem the makes the Orchid results fall below the Daubert standard for reliability.

Appellant would respectfully request that this Court find that the appellate court failed to utilize the proper standard of review in analyzing the admissibility of the miniFiler tests in this case.

## Prayer

WHEREFORE, PREMISES CONSIDERED, LESTER RAY GUY, Petitioner in the above styled and numbered cause respectfully prays that this Court grant this Petition for Discretionary Review, set this cause for oral argument so that this Court may grant any and all relief to which Petitioner is entitled.

Respectfully submitted,

**ARIEL PAYAN**
Attorney at Law
1012 Rio Grande
Austin, Texas 78701
Tel. 512/478-3900
Fax: 512/472-4102

by:    /s/ Ariel Payan
**Ariel Payan**
State Bar No. 00794430

Attorney for Petitioner

## Certificate of Delivery

This is to certify that a true and correct copy of the above and foregoing "Petition for Discretionary Review" was hand-delivered, mailed postage pre-paid or transmitted via telecopier (*fax*) to the office of the District Attorney of Travis County, Texas, and to the State Prosecuting Attorney's Office.

/s Ariel Payan
**Ariel Payan**

11

## Certificate of Compliance

I hereby certify pursuant to T.R.A.P. 9.4(i)(3), the word count for this document, as determined by the word processing program is ___2279___ .

___/s/ Ariel Payan___
**Ariel Payan**

**APPENDIX**

2014 WL 5423760
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
DO NOT PUBLISH
Court of Appeals of Texas, Austin.

Lester Ray Guy, Appellant
v.
The State of Texas, Appellee
NO. 03–12–00466–CR | Filed: October 22,
2014

FROM THE DISTRICT COURT OF TRAVIS
COUNTY, 331ST JUDICIAL DISTRICT, NO.
D–1–DC–10–302548, HONORABLE DAVID
CRAIN, JUDGE PRESIDING

**Attorneys and Law Firms**

Ariel Payan, The Law Offices of Ariel Payan, Austin,
TX, for Appellant.

M. Scott Taliaferro, Assistant District Attorney,
Austin, TX, for Appellee.
Before Justices Puryear, Pemberton, and Field

*MEMORANDUM OPINION*

David Puryear, Justice

**\*1** Lester Ray Guy appeals his conviction of capital
murder for the 1978 rape and asphyxiation of an elderly
woman, Hazel Ivy. For over twenty years the crime
went unsolved, but beginning in 2001 the Austin Police
Department's cold-case unit reopened the investigation,
eventually subjecting stored biological evidence from
Ivy's autopsy to DNA testing and finding probable

cause to charge appellant. In 2012, the case was tried
to a jury, which found appellant guilty. The court
sentenced appellant to life imprisonment, consecutive
to the life sentence he is currently serving for an
unrelated offense. Guy appeals his conviction in nine
issues. For the reasons that follow, we affirm his
conviction and punishment.

***Factual and Procedural Background***
Sixty-six-year-old Ivy was found dead in her apartment
on September 15, 1978. At trial, the Travis County
medical examiner testified that he performed an
autopsy on Ivy's body and determined that she had
been raped and killed by asphyxiation, possibly by
smothering with a pillow. The medical examiner also
testified that he had taken two smears from Ivy's vagina
and affixed them to laboratory slides for examination.[1]
He found sperm on the slides, shared his findings with
the police department, and stored the slides in the
medical examiner's offices. Evidence showed that
several items of physical evidence were also collected
at the crime scene, including sheets from the bed where
Ivy was found.

Although appellant's name surfaced during initial
investigation of the crime, no charges were filed against
him at the time, and the case went unsolved for many
years. The vaginal slides remained in the medical
examiner's offices, and the other physical evidence
remained in the Austin Police Department's evidence
storage room.[2] In 2001, the case was assigned to
Sergeant Scott Ehlert with the Austin Police
Department's cold-case unit. Ehlert testified at trial that
he obtained the vaginal slides from the medical
examiner's office and submitted one of them (Vagina 1)
to the Department of Public Safety (DPS) Crime Lab
for DNA testing but that the results produced only a
partial DNA profile for the sperm contributor
insufficient to identify a suspect. Concerned about
possible depletion of the samples, Ehlert testified that
he decided not to seek further DNA testing at that
time.

In 2003, appellant agreed to meet with Ehlert to
discuss the case. At the time, appellant was
incarcerated at the Texas Department of Criminal
Justice (TDCJ) for an unrelated offense and was
transported to Austin for the meeting. After the
meeting, Ehlert transported appellant back to TDCJ

custody and purchased him a fast-food meal on the way. Appellant left his fast-food trash in Ehlert's car, which Ehlert later collected and submitted to the DPS Crime Lab for DNA analysis.

**\*2** The DPS lab obtained a partial DNA profile from appellant's drinking straw and compared it with the DNA profile from the Vagina 1 slide. From that comparison, DPS witnesses testified that appellant could not be excluded as the contributor of the sperm cells on the slide. However, the DPS analysis also indicated that the "random match probability"[3] that an individual other than appellant was the contributor was "only 1 in 75 for Caucasians, 1 in 94 for blacks, and 1 in 53 for Hispanics," and the investigation was again paused.

Ehlert testified that in 2007 he learned of a new DNA test called "mini-STR" or "mini-Filer," which he explained is more sensitive than a standard DNA test because it can obtain DNA profiles from old, degraded samples and very small amounts of genetic material. The cold-case unit submitted the Vagina 2 slide to Orchid Cellmark, a private lab in Dallas that was utilizing the new test. Orchid Cellmark's mini-STR test returned a DNA profile for the sperm contributor and compared it to appellant's DNA profile, obtained from buccal (saliva) swabs.[4] Orchid Cellmark employee Huma Nasir, one of the State's expert witnesses, testified that the probability of an individual other than appellant matching the Vagina 2 profile were 1–in–186 million African–Americans.[5] Dr. Ranajit Chakraborty, a statistical geneticist who developed some of the technologies used in DNA testing, also testified as an expert witness for the State. Dr. Chakraborty testified that he reviewed Orchid Cellmark's mini-STR protocol both generally and as applied in this case for accuracy and reliability and determined it to be sound.

The most contentious issue at trial and on appeal involves Orchid Cellmark's interpretation of the mini-STR results. The State's experts explained that DNA testing involves the generation of a graph known as an electropherogram, which maps "peaks" reflecting the existence of particular DNA markers (called "alleles" and each identified by a number) at particular locations (loci) in a DNA strand. In most cases, at any given locus there are two alleles (one contributed by the individual's mother and another by the individual's father).[6] Two distinct peaks at a particular locus on the electropherogram signals the presence of two different alleles there, which is referred to as heterozygotic. If the individual received identical alleles from both his mother and father, that locus is referred to as homozygotic, and ordinarily the electropherogram would reflect only one peak at that locus. The electropherogram measures peaks in "relative fluorescence units" (RFUs), reflecting the presence of particular alleles and the absence of others at each studied locus. The height and location of the RFU peak indicates which alleles are present and at which loci, and labs conducting DNA tests utilize "calling thresholds." If an RFU peak is above the minimum calling threshold, the lab "calls" that allele for the targeted locus and considers it a part of the DNA profile it is generating.

**\*3** Nasir testified that the mini-STR test analyzes eight of the fifteen loci that are analyzed in standard STR[7] testing but that the technology for both tests is basically the same. She further testified that the mini-STR is commonly used for degraded DNA (where the DNA has broken down into smaller fragments) or for very low quantities of DNA and is more sensitive than regular STR testing because it can analyze smaller DNA fragments by using a different chemical composition in the testing process.

Nasir explained that in analyzing an electropherogram, a DNA profile is created, identifying which alleles are present at each of the targeted loci and that her lab's electropherogram of the sperm in the Vagina 2 slide identified only one significant peak at what is referred to as the "FGA locus"—allele number 19.[8] Various experts testified that individual locus results can sometimes be inconclusive. One reason they provided is that with degraded or low-quantity DNA samples, which was the case with the Vagina 2 slide, there is a possibility of "allelic dropout," meaning that one of the two alleles present at a particular locus is not registering on the electropherogram because of its degradation or low quantity. However, the various experts explained that a single peak at any given locus could also signify that the locus is homozygotic because, for instance, the individual received a "19" at the locus from his mother and father, resulting in only one RFU peak on the electropherogram.

Nasir testified that with respect to the FGA locus, she could not definitively determine whether the single

RFU peak was due to allelic dropout or because the allele at that locus was homozygotic. Because Nasir could not conclusively make such a determination, and because of her experience and knowledge that allelic dropout commonly occurs in degraded and low-quantity DNA samples, she determined that appellant could not be excluded as the donor of the sperm (because the FGA allele identified a "19," and appellant's profile at the FGA locus contains a "19" and a "23"). Accordingly, Nasir did not include the FGA locus in her calculation of random match probability. She testified that because excluding the FGA locus from her calculations resulted in fewer loci matching appellant to the Vagina 2 sperm DNA, her calculations were more "conservative" (i.e., more favorable to appellant) than if she had included the FGA locus. Dr. Chakraborty testified that he reviewed Nasir's results and concurred with her decision to exclude the FGA locus.

**\*4** Dr. Chakraborty also testified that while Nasir's random match probability calculation was accurate, he was able to calculate an even more accurate probability because he had access to population data for one of the loci targeted by the mini-STR test to which Orchid Cellmark did not. Using the additional population data, Dr. Chakraborty testified that the probability that the sperm contributor was an African–American unrelated to appellant were 1–in–2.2 billion. He testified that the entire world population at the time of the homicide was only close to two billion. Dr. Chakraborty also provided what he described as a "more conservative" probability calculation, due to the fact that in statistics, when a particular DNA profile is in fact present in a certain population, there is a greater chance that another individual will exhibit that same profile. Dr. Chakraborty testified that using this "more conservative" approach, the odds of finding another African–American with the same seven-loci profile as appellant were 1–in–1.08 billion.

**Issues on appeal**

Appellant first challenges the sufficiency of the evidence to support his conviction. When reviewing an evidentiary-sufficiency issue, we must consider all of the evidence in the light most favorable to the verdict and then determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307 (1979); *Clayton v. State,* 235

S.W.3d 772, 778 (Tex.Crim.App.2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Clayton,* 235 S.W.3d at 778. Our review of "all of the evidence" includes evidence that was properly and improperly admitted, and when the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution. *Id.* Direct and circumstantial evidence are treated equally, and circumstantial evidence alone can be sufficient to establish guilt. *Id.*

Appellant makes two main arguments challenging the sufficiency of the evidence to support the verdict: (1) the mini-STR test that Orchid Cellmark performed, and on which the State relied almost exclusively in establishing appellant's guilt, was invalid because it used only seven loci to establish the sperm DNA profile and (2) the DNA test on the Vagina 1 slide originally performed by DPS employee Gary Molina conclusively excluded appellant as the perpetrator.

With respect to the mini-STR test, various experts asserted that the test is effective, reliable, and widely used, especially in cases where DNA has degraded or is of low quantity, despite the fact that it targets only eight of the fifteen loci targeted by the regular STR test. Nasir and Dr. Chakraborty explained the phenomenon of allelic dropout and why use of only seven of the eight targeted loci and exclusion of the FGA locus in their statistical analyses was an appropriate and conservative approach in this case, where there were strong indicators that allelic dropout had occurred. Dr. Chakraborty reviewed Orchid Cellmark's electropherograms, confirmed Nasir's interpretation of the results, and provided further statistical analysis. Dr. Chakraborty also explained that a homogzygotic FGA locus is unlikely in this case based on the relative peak heights of the other loci and because the chance of that locus being homozygotic is only sixteen percent due to the many alleles possible there.

Appellant's expert witness, Dr. Laurence Mueller, testified that because there was no way to confirm that allelic dropout indeed occurred at the FGA locus, it was possible that the locus was homozygotic, which would have conclusively excluded appellant from being the sperm contributor. Dr. Mueller suggested that the

probability of allelic dropout occurring at the FGA locus could be estimated and added into the calculations performed by Dr. Chakraborty and Nasir, and he criticized their analyses for not so doing but, rather, simply excluding the locus from their calculations. However, Dr. Mueller offered no alternative statistical analysis reflecting allelic-dropout probability for the mini-STR tests performed here, merely noting that some researchers in Europe had recently validated a study for a similar DNA test kit that provided "reasonably good" predictions of allelic dropout rates while conceding that dropout probability rates for the mini-STR test were not readily available.

**\*5** The jury was free to assign weight to these various expert opinions, as issues of credibility and weight of the evidence lie exclusively within the province of the jury. *See Brooks v. State,* 323 S.W.3d 893, 911–13 (Tex.Crim.App.2010) (direct-appeal courts are not permitted to act as "thirteenth juror"). We conclude that the record contains sufficient evidence to support appellant's conviction based on the mini-STR test and its interpretation.

With respect to DPS employee Molina's Vagina 1 DNA test, appellant cites evidence in the form of Defense Exhibit 1 (a table generated by Molina indicating which alleles were present at each locus) identifying alleles at two loci (one of which was the FGA) that are inconsistent with appellant's DNA profile. However, neither appellant nor the State specifically questioned Molina about that exhibit and its alleged conclusiveness that appellant could not have been the perpetrator. And, despite Defense Exhibit 1, Molina stated at least twice in his testimony that appellant, in fact, could *not* be excluded as the contributor of the sperm found inside the victim. Moreover, every other witness who testified about the various DNA tests performed—including appellant's own expert, Dr. Mueller—similarly concluded that appellant could *not* be excluded by virtue of any of the test results, including the original Molina test.

Furthermore, several witnesses (including Dr. Mueller) provided an explanation of the alleged "two-loci mismatch" between appellant's DNA and the DNA recovered from the Vagina 1 slide that the jury could have found credible: because the quantity of biological material tested was both very small and very old and degraded, there was likely "allelic dropout" at those

loci, making it possible that other alleles (matching appellant's) were present at the loci but simply not registering on the electropherograms.[9] To the extent that Defense Exhibit 1 contradicts the testimony from several other live witnesses, the jury was free to disregard that evidence, and we may not supplant the jury's fact-finding role with respect to its weight. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988) (it is not reviewing court's duty to disregard, realign, or weigh evidence). We hold that the evidence was sufficient to support appellant's conviction and, accordingly, overrule his first issue.

Appellant's second issue argues that the trial court erred in denying his motion to suppress evidence in the form of the drinking straw that he left behind in the police car. We review a trial court's ruling on a motion to suppress evidence for abuse of discretion, viewing the facts in the light most favorable to the trial court's decision. *Shepherd v. State,* 273 S.W.3d 681, 684 (Tex.Crim.App.2008). We give "almost total deference" to the trial court's express or implied determination of historical facts and review de novo its application of the law of search and seizure to those facts. *Id.*

**\*6** Appellant argues that he had a legitimate expectation of privacy in his DNA and that the State violated this by seizing his fast-food trash without his consent. *See Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996) (en banc) (burden of establishing legitimate expectation of privacy rests on defendant). However, the trial court could reasonably have found that appellant had no legitimate expectation of privacy in this instance because he was incarcerated at the time, and prisoners have greatly diminished privacy rights and no legitimate expectation that their DNA will remain private. *See Oles v. State,* 993 S.W.2d 103, 108 (Tex.Crim.App.1999) (lowered expectation of privacy exists in arrest and detainment situations); *Pollard v. State,* 392 S.W.3d 785, 797 (Tex.App.—Waco 2012, pet. ref'd) ("[C]ollection of DNA from prisoners has been found to be reasonable in light of an inmate's diminished privacy rights, the minimal intrusion involved, and the legitimate government interest in using DNA to investigate crime."); *see also* Tex. Gov't Code § 411.148 (specifically authorizing collection of DNA from prisoners); *Velasquez v. Woods,* 329 F.3d 420, 421 (5th Cir.2003) (collection of DNA samples from felons does not violate Fourth Amendment). Not only was appellant incarcerated and therefore lawfully

4

in police custody at all relevant times, but also there was no physical intrusion involved in obtaining appellant's DNA from the fast-food trash.

The trial court could also have reasonably concluded that appellant abandoned the trash and thereby had no legitimate expectation of privacy therein. *See Comer v. State,* 754 S.W.2d 656, 659 (Tex.Crim.App.1986) (en banc) (op. on reh'g) (defendant must intend to abandon property and must freely decide to abandon it, and decision to abandon must not merely be direct result of police misconduct); *Hawkins v. State,* 758 S.W.2d 255, 257 (Tex.Crim.App.1988) (general rule is that when police take possession of abandoned property, there is no seizure under Fourth Amendment); *Pollard,* 392 S.W.3d at 797–98 (where defendant left spoon and cup behind in detox cell, he did not demonstrate genuine intention to keep DNA private and therefore abandoned it).[10] The trial court did not abuse its discretion in denying appellant's motion to suppress, and we overrule his second issue.

In his third issue, appellant argues that the trial court erred in denying his speedy-trial motion. The right to a "speedy" trial attaches once a person is arrested or charged with an offense, and motions challenging an infringement of this right are analyzed under the *Barker* test, which is a balancing test in which the conduct of both the State and the defendant are weighed and which must first be triggered by a delay that is unreasonable enough to be "presumptively prejudicial." *See Barker v. Wingo,* 407 U.S. 514, 530–31 (1972); *Cantu v. State,* 253 S.W.3d 273, 280–81 (Tex.Crim.App.2008). The four main factors considered in determining whether a speedy-trial violation has occurred are: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant resulting from the delay. *See Shaw v. State,* 117 S.W.3d 883, 888–89 (Tex.Crim.App.2003). If the right has been violated, the remedy is dismissal of the charging instrument with prejudice; because this is a radical remedy, "courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Cantu,* 253 S.W.3d at 281.

The appellate court applies an abuse-of-discretion standard of review for the factual components of a ruling on a speedy-trial motion and a de novo standard of review for the legal components. *Id.* at 282. Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is purely a legal question. *Id.* The appellate court must uphold the trial court's ruling if it is supported by the record and is correct under the applicable law. *Shaw,* 117 S.W.3d at 889.

**\*7** The first factor, length of delay, is measured from the time the defendant is arrested or formally accused, and delay approaching one year is sufficient to trigger a speedy-trial inquiry. *Id.* Here, a probable cause affidavit was issued for appellant's arrest on December 13, 2010, and the trial began on May 29, 2012, an interval of almost eighteen months. This delay meets the "presumptively prejudicial" threshold and therefore triggers inquiry into the three other factors. *See id.* This factor itself also weighs slightly in favor of appellant because the delay stretches somewhat beyond the minimum of about a year needed to trigger judicial examination of the claim. *See id.*

With respect to the reason for the delay, a neutral reason such as overcrowded courts or negligence should not be given significant weight against the government, and a valid reason should not be weighed against the government at all. *State v. Munoz,* 991 S.W.2d 818, 822 (Tex.Crim.App.1999). At the hearing on appellant's motion, the State asserted that the delay was due to a crowded docket in Travis County and to the challenges of prosecuting an offense that occurred in the distant past. There was no evidence of deliberate attempts by the State to delay the trial. We conclude that this factor at most weighs slightly in favor of appellant.

Regarding the third factor, the defendant's assertion of his right to a speedy trial, appellant made no attempt to assert that right until he filed his motion to dismiss on December 20, 2011, over a year after he was charged. The trial began in May 2012, and appellant did not seek a hearing on his motion until the first pretrial hearing in April 2012, over three months after he filed it. Such delays in asserting a right to a speedy trial "make[ ] it difficult for a defendant to prevail on a speedy trial claim." *Shaw,* 117 S.W.3d at 890. "This is so because a defendant's failure to make a timely demand for a

speedy trial indicates strongly that he did not really want one and that he was not prejudiced by not having one." *Id.* This factor weighs moderately to heavily in the State's favor.

Finally, the fourth factor—prejudice to the defendant—does not weigh in appellant's favor at all and is, at best, neutral. The prejudice must be assessed in light of the interests that the speedy-trial right is designed to protect: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired, with this last subfactor being the most serious. *Id.* Here, appellant was not prejudiced with respect to the first interest, as he was already in prison for an unrelated offense at all relevant times. He also offered no evidence that the delay caused him any unusual anxiety or concern beyond the level normally associated with being charged with a felony sexual crime. *Id.* Finally, appellant offered no evidence that his ability to defend himself was adversely affected by the approximate eighteen-month delay.

Weighing all four of these factors together, we hold that their balanced weight is against finding a violation of appellant's right to a speedy trial and that the trial court did not err in denying his motion to dismiss the indictment. We overrule appellant's third issue.

Appellant next alleges that he was denied his constitutional right to "due process" when, prior to voir dire, the district clerk provided the State with juror questionnaires that contained greater demographic information than those provided to defense counsel. Specifically, the State received venire members' full residential addresses, while appellant received only their zip codes. Also, the State received venire members' social security numbers and dates of birth, while appellant received only their ages. Appellant discovered this questionnaire discrepancy at the hearing during which the parties and the Court discussed venire-member strikes and jury composition. He argues that the discrepancy gave the State an "unfair advantage" during voir dire and violated his right to due process, which requires a "reasonably level playing field" between the defense and prosecution at trial. *See De Freece v. State, 848 S.W.2d 150, 159 (Tex.Crim.App.1993)* (en banc) (applying principle of "level playing field" to appointment of neutral

psychiatrist to assist defendant with insanity defense). Without this additional demographic information, appellant complains, his counsel was unable to adequately prepare to question the venire members and run criminal background checks on them. The trial court overruled appellant's objection to this discrepancy after determining that he failed to demonstrate any harm.

**\*8** Appellant argues that the questionnaire discrepancy constitutes a constitutional error, *see* Tex.R.App. P. 44.2(a), but he cites no authority supporting such contention. We conclude that the error, if any, was not constitutional and is subject to review only for error affecting a substantial right. *See id.* (b) (we must disregard any error not affecting a substantial right). We conclude so for two reasons.

First, regarding the undisclosed home addresses of the venire members, appellant could simply have asked the members during voir dire to provide their addresses or otherwise identify the particular part of town in which they resided, to the extent that he truly deemed the information relevant or crucial to the informed exercise of his peremptory strikes. *See Gonzales v. State, 3 S.W.3d 915, 917 (Tex.Crim.App.1999)* (jury questionnaires do not relieve counsel of duty to elicit pertinent information during voir dire); *Murphy v. State, 229 S.W.3d 334, 338 (Tex.App.—Amarillo 2006, pet. ref'd)* (purpose of juror questionnaires is to save time by providing basic information that would otherwise be obtained by oral questions). " 'Diligent counsel' will not rely on written questionnaires to supply any information that counsel deems material." *Gonzales, 3 S.W.3d at 917*. Although appellant emphasizes the importance of the demographic information revealed by the venire members' home addresses, "it was apparently not important enough to seek the same information" by asking the venire members directly for it. *Murphy, 229 S.W.3d at 338*. Moreover, the record shows that defense counsel was not denied the opportunity to inquire of the venire on any matter that would have been included in a written questionnaire or that he was limited in the amount of time permitted to conduct voir dire. The fact that the State had access to the venire members' addresses prior to voir dire did not excuse appellant from his duty to elicit that same information if he truly deemed it material.

Secondly, as to appellant's alleged inability to run criminal background checks because he was not provided venire members' social security numbers and dates of birth, the State did run background checks and offered to provide appellant such information, as well as the other missing data, at the hearing when appellant first learned about and objected to the questionnaire discrepancy. However, appellant did not accept the State's offer to view the information or otherwise pursue the matter, such as seeking additional voir dire time. Furthermore, appellant has not established that he would have exercised any particular peremptory challenge differently if the personal information had been disclosed to him earlier or that he was otherwise, in fact, harmed.

On this record, we hold that the trial court did not err in determining that the questionnaire discrepancies did not unfairly "tip" the playing field in the State's favor and that any error attributable to the trial court resulting from the discrepancy did not affect appellant's substantial rights. Accordingly, we overrule appellant's fourth issue.

Appellant asserts in his fifth issue that the trial court improperly denied his *Batson* challenge to the State's peremptory strikes of two African–American jurors. *See Batson v. Kentucky,* 476 U.S. 79, 89 (1986) (race-based jury strikes deny defendant right to judgment by one's peers). A *Batson* challenge to a peremptory strike consists of three steps: (1) the opponent of the strike must establish a prima-facie showing of racial discrimination, (2) the proponent of the strike must articulate a race-neutral explanation, and (3) the trial court must decide whether the party opposing the strike has proved purposeful racial discrimination. *Grant v. State,* 325 S.W.3d 655, 657 (Tex.Crim.App.2010). In reviewing a trial court's ruling on a *Batson* challenge, the appellate court must review the record in the light most favorable to the trial court's ruling and not disturb the ruling unless it is clearly erroneous. *Young v. State,* 283 S.W.3d 854, 866 (Tex.Crim.App.2009). Such a ruling is not clearly erroneous if it is supported by the record. *Vargas v. State,* 838 S.W.2d 552, 554 (Tex.Crim.App.1992) (en banc).

**\*9** Because the State offered its reasons for the strikes, the prima-facie-case inquiry is moot, and we move on to whether the reasons offered are in fact race-neutral.

*Johnson v. State,* 68 S.W.3d 644, 649 (Tex.Crim.App.2002). With respect to both struck jurors, Numbers 18 and 19, the record demonstrates that the State provided the court with a credible, race-neutral explanation: the jurors had stated on their questionnaires that they had never been accused of a crime, but in the course of the State's questioning them in voir dire, it turned out that the two jurors had not answered those questions truthfully. The State struck a third, non-African-American juror for this very same reason. The trial court found the State's reason for striking the jurors to be non-discriminatory, and we find such ruling supported by the record and not clearly erroneous. Furthermore, appellant did not meet his burden on the third step—to prove that the State's race-neutral explanation was incorrect or that it was a pretext for discrimination. *Id.* at 650. We overrule appellant's fifth issue.

In his sixth issue, appellant argues that local law enforcement destroyed physical evidence prior to trial that would have exonerated him. Specifically, he complains about various items, including bed sheets and hairs, that had gone missing in the decades since the offense. Appellant asserts that the State "acted in bad faith" by destroying the evidence or failing to "track down or even try to locate" the last person in charge of it. The State responds that appellant failed to preserve this issue and that, in any case, he has failed to establish that the police acted with bad faith in relation to the missing evidence. We agree.

Appellant did not seek dismissal of the indictment on due-process grounds or otherwise object or present this issue to the trial court and obtain an adverse ruling. He has, therefore, waived the issue and cannot properly raise it for the first time on appeal. *See* Tex.R.App. P. 33.1(a); *Yazdchi v. State,* 428 S.W.3d 831, 844 (Tex.Crim.App.2014) (failure to object may waive even constitutional errors). However, even if appellant had not waived this issue, we would overrule it because there was no evidence that the missing evidence (which was never subjected to forensic testing) would have been exculpatory or that law enforcement acted in bad faith. *See Arizona v. Youngblood,* 488 U.S. 51, 56 (1988) (for evidentiary material "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," failure to preserve such potentially useful evidence does not constitute denial of due process unless criminal defendant can show bad faith on part of

police); *Ex parte Napper,* 322 S.W.3d 202, 230 (Tex.Crim.App.2010) (same). Accordingly, we overrule appellant's sixth issue.

Appellant next argues that the trial court erred in overruling his motion for mistrial, which he filed after learning that two jurors were present in an elevator when an attorney unconnected to this case asked appellant's attorney how many "priors" appellant had, allegedly in violation of article 36.22 of the Code of Criminal Procedure. *See* Tex.Code Crim. Proc. art. 36.22 ("No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."). This elevator interaction was immediately brought to the attention of the trial court, which conducted a hearing outside the presence of the jury before the trial resumed. At the hearing, one of the two jurors indicated that he had not heard any of the above-referenced interaction. The other juror stated that immediately upon hearing the question, he blocked his ears with his hands and turned away from the person speaking. He also indicated that he had not communicated any of this information to any of the other jurors and that the elevator interaction would not affect his ability to make a fair and impartial decision. The judge instructed both jurors to disregard what, if anything, they heard in the elevator and to not repeat it to any other juror, and both jurors indicated that they would be able to follow these instructions. Appellant then filed a motion for mistrial, which the trial court denied.

**\*10** Mistrial is appropriate for only "highly prejudicial and incurable errors," and a trial court's denial of a motion for mistrial is reviewed under an abuse-of-discretion standard. *Simpson v. State,* 119 S.W.3d 262, 272 (Tex.Crim.App.2003). Because the primary goal of article 36.22 is to insulate jurors from outside influence, if a violation is shown, the effectiveness of possible remedies will be determined in part by whether the conversation influenced the juror. *Ocon v. State,* 284 S.W.3d 880, 884 (Tex.Crim.App.2009). A violation of article 36.22, once proven by the defendant, triggers a rebuttable presumption of injury to the accused, and a mistrial may be warranted. *Id.* When determining whether the State sufficiently rebutted the presumption of harm, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its determinations concerning credibility and demeanor. *Id.*

The Texas Court of Criminal Appeals has held that the phrase "to converse with a juror" in article 36.22 does not encompass statements made to jurors to which the juror does not respond. *See* *Palasota v. State,* 460 S.W.2d 137, 141 (Tex.Crim.App.1970) (because juror did not respond to remarks of unidentified woman asking how jurors could "sleep at night" and that "damned jury ought to be shot between the eyes," such remarks did not constitute "conversation" under article 36.22); *see* *Badgett v. State,* No. 04–07–00364–CR, 2009 WL 142324, at \*11 (Tex.App.—San Antonio Jan. 21, 2009, pet. ref'd) (mem.op.) (because juror did not respond to statement made by unidentified man who told juror that deceased victim had been "real nice young man," no "conversation" had occurred). Similarly, we conclude that the one unresponded-to question about how many "priors" appellant had did not constitute "conversation" under article 36.22, and there is no presumption of harm.

However, even if the elevator communication could be considered a "conversation" under article 36.22, the trial court could reasonably have determined that any presumption of harm was rebutted by the jurors' statements that they could be impartial and disregard the remark, especially in conjunction with the court's instruction to disregard the comment and not communicate it to other jurors, which we must presume the jurors followed. *See* *Waldo v. State,* 746 S.W.2d 750, 752–53 (Tex.Crim.App.1988); *see also* *Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex.Crim.App.2000) (in most instances, trial court's instruction to disregard cures error). The alleged error here was not "highly prejudicial and incurable," and we hold that the trial court's denial of appellant's motion for mistrial was within the zone of reasonable disagreement. We overrule appellant's seventh issue.

Lastly, appellant complains about the trial court's admission of expert testimony from Dr. Chakraborty and Nasir. Prior to admission of the expert testimony, the trial court held a *Daubert* hearing, the transcript of which is in the appellate record. Before admitting expert testimony, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education ("qualification"); (2) the subject matter of the testimony is an appropriate one for expert testimony ("reliability"); and (3) admitting the expert

testimony will actually assist the factfinder in deciding the case ("relevance"). *Davis v. State,* 329 S.W.3d 798, 813 (Tex.Crim.App.2010); *see also* Tex.R. Evid. 702. Appellant challenges the second condition, reliability, of the expert testimony. Three criteria must be met to show reliability of scientific evidence: (1) the underlying theory is valid, (2) the technique applying said theory is valid, and (3) the technique was properly applied on the occasion in question. *Bigon v. State,* 252 S.W.3d 360, 367 (Tex.Crim.App.2008). A trial court's ruling on the admissibility of expert testimony is reviewed for abuse of discretion, and that ruling must be upheld if it is within the zone of reasonable disagreement. *Id.*

**\*11** Regarding Nasir, appellant asserts that her testimony is unreliable because: (1) Orchid Cellmark uses less than the manufacturer-recommended amount of genetic material in performing the mini-STR test; (2) the validation studies Orchid Cellmark completed were not peer reviewed; and (3) Orchid Cellmark had not completed a "stochastic threshold" study for allelic dropout and, therefore, Nasir's theory about allelic dropout was invalid and improperly applied on this occasion.

With respect to appellant's contention about the manufacturer's recommended sample size, Nasir testified at the *Daubert* hearing that although the mini-STR manufacturer identifies an optimum range for sample size, Orchid Cellmark had performed its own internal validation and sensitivity studies in 2008 to determine the smallest sample sizes from which they were able to obtain full DNA profiles. The sample size used in this case was consistent with the sample sizes used in the validation studies. Nasir further explained that the manufacturer's recommendation was based on what is known as a "full volume reaction," but Orchid Cellmark had internally validated use of the mini-STR kit using a "half volume reaction," making its similar application of the mini-STR in this case appropriate and reliable.

Nasir addressed the lack of outside peer review by explaining that in the industry, independent labs cannot publish validation studies because the information is proprietary. However, she further explained that Orchid Cellmark's internal validation studies were independently reviewed by two different agencies that ensured the lab is following the guidelines of the

national DNA advisory board. Finding that the validations were acceptable, both outside agencies accredited Orchid Cellmark with respect to its mini-STR protocols.

And finally, regarding appellant's complaint that Orchid Cellmark had failed to complete a stochastic threshold study[11] prior to testing the samples at issue here, we conclude that Nasir provided sufficient testimony explaining how such a study was not necessary for appropriate use of the mini-STR and application of the allelic dropout theory or for reliability of the test results. She explained that the use of a stochastic threshold "is not a DNA advisory board requirement for a validation" and that her decision to exclude the FGA locus was, in fact, a conservative decision due to the possibility of allelic dropout, which is a common phenomenon with degraded and very small quantities of DNA and with the design of the mini-STR test kit in particular. We conclude that the foregoing provided a reasonable basis for the trial court to conclude that Nasir's expert testimony was reliable.

Appellant raises the very same issues about reliability concerning Dr. Chakraborty's testimony, specifically complaining about his reliance on the Orchid Cellmark tests in preparing his statistical analysis. Because appellant raises no issues specific to Dr. Chakraborty that differ from those he raises with respect to Nasir and Orchid Cellmark's use of the mini-STR test, we need not address this issue separately.[12] Accordingly, we overrule appellant's eighth and ninth issues and hold that the trial court did not abuse its discretion in admitting the expert testimony of Nasir and Dr. Chakraborty.

## CONCLUSION

**\*12** For the foregoing reasons, we overrule each of appellant's issues and affirm the trial court's judgment of conviction and punishment.

9

Footnotes

1    The two vaginal slides are referenced herein (and in the record) as Vagina 1 and Vagina 2. The examiner also took samples from Ivy's anus, throat, and mouth, but those samples are not relevant to the issues on appeal because they were not subjected to DNA testing.

2    Sometime before 2001, all of the physical evidence except the medical examiner's slides—including sheets, pillows, and Ivy's clothing—went missing and has never been recovered. There is no definitive explanation in the record for its disappearance.

3    In DNA analysis, random match probability calculates the likelihood of selecting a random person unrelated to the suspect who could be the source of the DNA profile in an evidence sample.

4    The trial court did not permit the jury to hear evidence about how or why buccal swabs were obtained from appellant for the purpose of comparing them to the Vagina 2 profile. The record contains a pretrial exhibit of the State, which was not admitted at trial, in the form of a search warrant issued to obtain buccal swabs from appellant after the Orchid Cellmark Vagina 2 profile was run through the DPS CODIS database and identified a "hit" in the person of appellant.

5    Appellant is African–American.

6    Experts testified that in some circumstances, there can be more than two alleles at a particular locus, for example if the DNA sample is a mixture of more than one person's DNA or in uncommon situations where an individual has received more than one allele from a parent at a particular locus, which phenomenon is not expected to occur at more than a handful of loci for any given individual.

7    STR stands for "short tandem repeat" and corresponds to the particular number assigned to an allele. A "19" at a particular locus, for example, means that there are nineteen repeats of a tandem pair found at that locus (tandem pairs are either adenosine and thymine or guanine and cytosine). State witnesses explained that although well over 99% of human DNA is common to all humans, each individual's entire DNA profile is unique. STR and mini-STR testing specifically target some of the very fragments of DNA that differ among individuals: the loci wherein the number of short tandem repeats vary. When compiling databases for the purpose of computing random match probability, scientists determine how many persons within a given known sample have the various combinations of tandem repeats at each studied locus and assign a probability for each allelic combination to the larger Caucasian, African–American, and Hispanic populations.

8    The record does not explain the acronym "FGA" or identify what genetic trait correlates with the FGA locus.

9    None of the electropherograms were admitted into evidence, and Molina's table (Defense Exhibit 1) was a summary of his interpretation of the Vagina 1 sperm electropherogram. Another DPS witness, Kimberly Clement, also analyzed the Vagina 1 sperm electropherogram and generated a different table, interpreting the results differently and noting that the alleles at the two challenged loci included some unknown or "inconclusive" alleles and that, therefore, appellant could not be excluded as the contributor.

10   We reject appellant's argument that he did not "freely" decide to abandon the trash by virtue of the officers' premeditated decision to obtain his DNA from the fast-food meal. Appellant's actions in abandoning his trash were not the direct result of police misconduct as contemplated by *Comer* and its progeny. *See Comer v. State,* 754 S.W.2d 656, 659 (Tex.Crim.App.1988) (en banc) (op. on reh'g) (defendant's discarding contraband was direct result of unlawful search of vehicle).

11   Nasir explained that a "stochastic threshold" can be used to determine whether a particular locus is homozygotic. Although at the time of trial Orchid Cellmark had not yet completed its study to establish the threshold RFU above which the lab can confidently conclude that the alleles at a particular locus are homozygotic, she did testify that at Orchid Cellmark's current progress in the study, the lab was considering placing the threshold at no less than 400 RFUs but likely closer to 600 RFUs. The FGA peak for the Vagina 2 slide was 357 RFUs.

12    We note that the trial court had already conducted its *Daubert* hearing of Nasir and ruled that her testimony was admissible before it conducted its *Daubert* hearing of Dr. Chakraborty. *See Somers v. State,* 368 S.W.3d 528, 536 (Tex.Crim.App.2012) (validity of underlying scientific theory and validity of technique applying that theory can be determined through judicial notice).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Print this page

# Case # PD-1564-14

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 02/17/2015 06:35:42 PM |
| Case Number | PD-1564-14 |
| Case Description | |
| Assigned to Judge | |
| Attorney | Ariel Payan |
| Firm Name | Ariel Payan |
| Filed By | Ariel Payan |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | 4037660027997998 |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | 6890180 |
| Order # | 004185185-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFileAndServe |
| Filing Code | Petition for Discretionary Review |
| Filing Description | |
| Reference Number | |
| Comments | |
| Status | Rejected |

## Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|
| Other | 02/19/2015 01:42:32 PM | The petition for discretionary review does not contain the identity of Judge, Parties and Counsel in compliance with [Rule 68.4(a)]; this page is missing the name of the trial court judge. You have ten days to tender a corrected petition for discretionary review. |

## Documents

| | | |
|---|---|---|
| *Lead Document* | Guy, Lester PDR Application.pdf | [Original] |

## eService Details

| Name/Email | Firm | Service Type | Status | Served | Date/Time Opened |
|---|---|---|---|---|---|
| Scott Taliaferro scott.taliaferro@co.travis.tx.us | | EServe | Sent | Yes | 02/17/2015 06:47:43 PM |
| Lisa McMinn Lisa.McMinn@spa.texas.gov | State Prosecuting Attorney | EServe | Sent | Yes | 02/18/2015 08:33:32 AM |